**Carolyn HURLEY, individually, and as parent and guardian of James T. McNey, Plaintiff–Appellant,**

v.

**UNITED STATES of America; Clinical Data, Inc., a Delaware Corporation, Defendants–Appellees.**

No. 89–2747.

United States Court of Appeals, Fourth Circuit.

Argued May 7, 1990.

Decided Jan. 23, 1991.

George Zacharias Petros, Fisher & Walcek (Kenneth A. Lechter, Fisher & Walcek, on brief), Marlow Heights, Md., for plaintiff-appellant.

Roann Nichols, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., on brief), Baltimore, Md., for defendants-appellees.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and SMITH, Senior United States Circuit Judge for the Federal Circuit, sitting by designation.

EDWARD S. SMITH, Senior Circuit· Judge:

Carolyn Hurley, individually and as parent and guardian of James T. McNey, sued the United States pursuant to the Federal Tort Claims Act [1] alleging medical malpractice by staff personnel at the National Institutes of Health. In this appeal, she claims that defendant breached the standard of care, thereby proximately causing its patient, McNey, to lose a substantial possibility of a successful recovery. The United States District Court for the District of Maryland concluded that a loss of a substantial possibility of successful recovery was not a cause of action recognized by Maryland law. We affirm.

### FACTS

James McNey ("McNey") was born in 1960 with congenital heart disease. By the

---

**1.** 28 U.S.C. §§ 1346(b), 2671 (1982).

time McNey had reached the age of thirteen, he had been admitted for treatment to the National Institutes of Health ("NIH") four times because of heart problems. While attending high school in 1978, McNey fell unconscious for a time and was subsequently admitted at NIH. The physicians implanted a permanent pacemaker to remedy the effects of the heart disease. McNey returned to NIH several times as an outpatient for routine examinations and once as an inpatient in 1982 after experiencing heart palpitations.

On January 30, 1985, McNey was admitted to NIH on a diagnosis of suspected bacterial endocarditis. Because McNey showed no cardiac symptoms and there were no beds available in the cardiac care unit, he was admitted to the eighth floor. The eighth floor was not a regular floor for cardiac patients and had no heart monitoring equipment or telemetry system.

As a result of McNey's complaints of irregular heart sensations, a Holter monitor was applied to him on February 13, 1985. A Holter monitor is a device which is affixed to the patient and records the heart's rhythm for a 24–hour period. The Holter monitor tapes were sent to Clinical Data for processing on February 14 and the results were returned to NIH on February 20, 1985. Dr. Tucker, the cardiology consultant, did not find the report on his desk or in his mailbox until February 28, 1985. The results evidenced abnormalities in McNey's cardiac rhythm and a pacemaker malfunction.

On February 27, 1985, McNey suffered a cardiac arrest while in his room. He was discovered by a kitchen worker who immediately alerted a nurse. A cardiac arrest team arrived and began administering CPR. The team revived McNey, but not before he experienced anoxia,[2] which caused severe and irreversible neurologic damage.

After the arrest of February 27, which was diagnosed as ventricular tachycardia, McNey was transferred to the cardiac care floor where he was monitored on telemetry. On April 3, 1985, McNey suffered a second cardiac arrest. However, because the arrhythmia disturbance was noted by telemetry, immediate treatment successfully resuscitated McNey without permanent damage.

Plaintiff-appellant Carolyn Hurley sued in the District Court of Maryland pursuant to the Federal Tort Claims Act[3] alleging medical malpractice by staff personnel at NIH. The district court ordered the issues of liability and damages bifurcated. This appeal concerns only the liability proceeding.

Appellant claims that the NIH physician's failure to read the Holter monitor results when they were received before the cardiac arrest occurred breached the standard of care. Although the results did not indicate that McNey could suffer a cardiac arrest, it did reveal that the pacemaker was malfunctioning and needed replacing. Appellant claims if the doctors had read the results timely, they would have decided to implant a pacemaker. The doctors would have chosen to implant a temporary pacemaker, rather than a permanent pacemaker because McNey was on antibiotics.[4] Moreover, because it is customary to monitor the performance of a temporary pacemaker, McNey would have been moved to the cardiac care floor and placed on telemetry. On telemetry, McNey's heart would have been continuously monitored, and the first cardiac arrest would have set off an alarm eliciting immediate response. Plaintiff claims an immediate medical response would have resuscitated him sooner, thereby allowing oxygen to get to his brain and preventing him from suffering irreversible brain damage.

Appellee concedes that the failure to timely read the Holter results was a breach of duty but denies that it proximately caused McNey's injury. The district court agreed with appellee that the causal connection asserted by appellant was based on

---

2. Anoxia is a severe lack of oxygen in the brain.

3. 28 U.S.C. §§ 1346(b), 2671.

4. The antibiotics were prescribed to remedy the suspected endocarditis.

a "progression of assumptions." The court concluded that appellant failed to show by a preponderance of the evidence that NIH's breach of the standard of care was the proximate cause of McNey's injury.

Appellant urged the district court to consider the case under the doctrine of "loss of a substantial chance of recovery." Under that doctrine, plaintiff must show by a preponderance of the evidence that defendant's negligence proximately caused plaintiff to lose a substantial chance of successful recovery. The district court refused to consider the doctrine because it has not been recognized in Maryland as a legal cause of action.

## ISSUE

■ Appellant does not contend that they have established medical malpractice based on traditional principles of negligence. The questions before us on appeal are whether the loss of a substantial possibility of successful recovery cause of action is recognized by Maryland law and whether plaintiff-appellant established the cause of action in the trial below. Because we conclude Maryland does not recognize this cause of action, we need not decide whether appellant established it at trial.

## DISCUSSION

In evaluating plaintiff's claim, we must note that Maryland law controls the issues of liability and damages.[5] Plaintiff has asserted a cause of action entitled "loss of a substantial possibility of successful recovery." This cause of action ordinarily alleges that the patient's recovery from an ailment is impaired, possibly due to the negligence of the defendant. However, a very similar cause of action is entitled "the loss of a substantial possibility of survival." This cause of action is utilized when the negligence of the defendant possibly caused the patient to die. Because both causes of action are very similar, we discuss both intermittently in our analysis of case history.

The whole concept of loss of a substantial possibility of survival first originated in *Hicks v. United States*.[6] In that case, a doctor breached his professional duty owed to a patient by misdiagnosing an ailment. Had the doctor accurately diagnosed the ailment, the proper course of action would have been to operate. The defendant argued that proximate cause was not established because it was merely speculative to conclude that a prompt operation would have successfully saved the plaintiff's life. However, the court concluded that the evidence showed that had the doctors operated promptly, the patient would have survived.[7] Therefore, the court resolved the issue of proximate cause in favor of the plaintiff. But then Judge Sobeloff went on to state what would become often quoted dicta [8] which precipitated misunderstanding throughout the courts.

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute *certainty* what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly. *Harvey v. Silber*, 300 Mich. 510, 2 N.W.2d 483 (1942).[9]

In order to address the confusion springing from this passage, we start by making three interpretive points.

---

5. 28 U.S.C. § 1346(b); *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

6. 368 F.2d 626 (4th Cir.1966).

7. *Id.* at 632.

8. *Fennel v. Southern Maryland Hospital Center,* 320 Md. 776, 786, 580 A.2d 206, 211 (1990).

9. *Hicks,* 368 F.2d at 632.

The first sentence premises the whole passage. "When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization."[10] In essence, the sentence states when it is determined that the defendant's breach of duty has caused the death of the patient, he cannot assert that, had he not breached the duty, the patient *might* have died anyway. Thus, when proximate cause is found, the defendant cannot speculatively assert that other conditions caused the harm in order to relieve himself of liability. This first sentence in the passage adds nothing new to the law of negligence.

The second sentence in the passage is the one that has been seriously misconstrued. "If there was any *substantial possibility* of survival and the defendant has destroyed it, he is answerable."[11] Some courts have since interpreted the words "substantial possibility" to have modified the law of medical malpractice.[12] However, the third and fourth sentences in the passage shed light on the proper interpretation of "substantial possibility." They say in essence that it is *rarely possible* for a plaintiff to show to an absolute certainty what would have happened had the defendant not been negligent. Thus, the plaintiff need *not* prove to a *certainty* that the plaintiff would have lived had she been treated in compliance with the standard of care. For support, Judge Sobeloff cited *Harvey v. Silber*,[13] which held that evidence showing that there is a probability, rather than a certainty, that an operation would have saved a patient's life is sufficient to prove that a negligent diagnosis was the proximate cause of death. Evidently, the message in the passage is that a plaintiff need not show to a certainty that surgery would have saved the patient's life. A probability of success is sufficient.

■ The law of negligence requires the plaintiff to prove by a preponderance of the evidence[14] that defendant's breach of duty caused the plaintiff's injury.[15] In other words, the plaintiff must prove the defendant's breach of duty was more likely than not (*i.e.*, probably) the cause of injury.[16] Therefore, the point made in the passage that causation must be proved to a probability, but not to a certainty, does not make any change in the law of causation.

The last point to be made about the passage regards *Gardner v. National Bulk Carriers, Inc.*,[17] which Judge Sobeloff cited as an apt analogy. In that case, a ship master refused to turn a ship around to search for a seaman who was last seen five and one-half hours before he was discovered missing. The district court denied liability because causation was absent. Judge Sobeloff's majority opinion reversed the district court because the defendant violated the "rescue doctrine" which is peculiar to admiralty law. "[A]dmiralty law annexes to a seaman's contract of employment an obligation on the part of the master to use every reasonable means to save the seaman's life if he goes overboard."[18] This special employment obligation imposes a duty on the ship master to attempt to rescue the overboard seaman "when there is a reasonable possibility of rescue."[19] Once the duty arises, total disregard of the duty by refusing to attempt to rescue the seaman imposes liability on the ship master.[20]

10. *Id.*

11. *Id.* (emphasis added).

12. *E.g., Waffen v. Dep't of Health & Human Services*, 799 F.2d 911, 922–23 (4th Cir.1986).

13. 300 Mich. 510, 2 N.W.2d 483 (1942).

14. *Shilkret v. Annapolis Emergency Hospital Ass'n*, 276 Md. 187, 190, 349 A.2d 245, 247 (1975).

15. *Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir.1982).

16. *Peterson v. Underwood*, 258 Md. 9, 17, 264 A.2d 851, 855 (1970).

17. 310 F.2d 284 (4th Cir.1962).

18. *Id.* at 286.

19. *Id.* at 287.

20. *Id.*

We do not see *Gardner* as analogous to the medical malpractice situation found in *Hicks*. *Gardner* only concerns a specialized duty peculiar to admiralty law which imposes liability on a highly-culpable [21] ship master through a relaxed causation requirement. Such a specialized duty with a "watered-down" causation requirement should not be extended from the high seas to the hospital bed.

Consequently, we now interpret a "substantial possibility" to be tantamount to a "probability." Therefore, we conclude that *Hicks* made no change to the law that requires the plaintiff to establish proximate cause by a preponderance of the evidence in order to prove medical malpractice negligence.[22] Initially, the Maryland courts did not come to this same conclusion.

The Maryland Court of Appeals first confronted *Hicks* in *Thomas v. Corso*.[23] In that case, a jury found the defendant negligent for failing to render timely health care to his injured patient who later died. Defendant asserted that no causal relation was established. The court concluded that evidence of defendant's admission that he *might* have revived the patient had he administered treatment earlier and expert testimony indicating that timely treatment was crucial was "sufficient to justify a jury finding [that] a substantial possibility of survival" was destroyed by defendant's negligence.[24] ·

In evaluating *Thomas*, the question arises whether the Maryland high court intended the "substantial possibility" standard to replace the traditional causation standard which required the plaintiff to prove the defendant's negligence probably caused the patient's death.[25] If it did so intend, a second question arises whether the high court construed "substantial possibility" to include possibilities that do not amount to probabilities.[26] If the answer to each question is yes, the plaintiff could prove actionable injury by merely proving the defendant's breach of duty created a chance of causing the patient's death, even if the patient had no greater than a 50% chance of surviving absent the negligence. Therefore, if the answer to both questions is yes, the court effectively has relaxed the proof of causation requirements in medical malpractice cases.

The first time the Fourth Circuit evaluated *Thomas* and *Hicks*, we did not go so far as to conclude that *Thomas* intended to relax causation standards. However, we did conclude that Maryland law recognized the loss of substantial possibility of survival as a separate cause of action.[27] The actual injury was not that of causing death, but of "depriv[ing] the patient of a substantial possibility of survival." [28] This conclusion purportedly left traditional causation rules intact because the plaintiff must prove by a preponderance of the evidence that the physician's neglect caused the patient's chances for survival to be diminished.[29]

On the other hand, we did conclude that a substantial possibility need not amount to a probability.[30] Therefore, if a plaintiff proved a doctor's negligence deprived the patient of any possibility of survival, even if the patient would have had no greater than a 50% chance of surviving absent any negligence, he could recover. This differs from traditional negligence principles be-

---

21. To breach the duty, the ship master must totally disregard the duty by refusing to attempt a rescue. We see this required degree of culpability more extreme than negligence and just short of intent on the culpability continuum.

22. *Clark v. United States,* 402 F.2d 950, 954 n. 4 (4th Cir.1968) ("Certainly *Hicks* laid down no new rule of law with respect to either negligence or proximate cause....").

23. 265 Md. 84, 288 A.2d 379 (1972).

24. *Id.* at 102, 288 A.2d at 390.

25. *Fitzgerald v. Manning,* 679 F.2d 341, 346 (4th Cir.1982).

26. A probability implies a chance that it is more likely than not, or that is greater than 50%. A possibility implies *any* chance regardless of whether it is greater than 50%.

27. *Waffen,* 799 F.2d 911.

28. *Id.* at 917.

29. *Id.* at 918.

30. *Id.* at 922.

cause the plaintiff need not prove that the patient would have probably lived had the doctor administered nonnegligent treatment. Consequently, when the traditional medical malpractice cause of action is juxtaposed to this new cause of action labeled "the deprivation of substantial possibility of survival," the principal difference is that causation is easier to prove under the new cause of action.[31] Instead of proving the defendant's negligence augmented the likelihood of death to a probability, the plaintiff will only have to prove that the defendant's negligence caused the likelihood of death to be augmented. Thus, the net effect of adopting this new cause of action is to relax proof of causation requirements in medical malpractice cases.

Our interpretation of Maryland law in *Waffen* is called into question because we were interpreting Maryland law as espoused in *Hetrick v. Weimer*,[32] which was later reversed by the Maryland Court of Appeals. In *Waffen*, we relied on the ruling of the Maryland Court of Special Appeals[33] which required the plaintiff to prove only that the doctor's negligence deprived the patient of a substantial possibility of survival to satisfy the causation element under the wrongful death statute. The Maryland Court of Appeals disagreed and reversed the Court of Special Appeals in *Weimer v. Hetrick*.[34]

In *Weimer*, the high court of Maryland first reviewed *Hicks* and *Thomas* and determined that, in both cases, the court actually found that the defendant's breach of duty was the proximate cause of death. The court did not believe that the language in both *Hicks* and *Thomas* was designed "to alter, without discussion, the rule of law governing the burden of proof so anciently formed and so uniformly applied in wrongful death cases under the Maryland statute."[35] It is an established principle that a plaintiff must prove the existence of causation by a preponderance of the evidence in any negligence case. The Maryland wrongful death statute can only be invoked *"against a person whose wrongful act caused the death of another."*[36] Therefore, a wrongful act which deprived the patient of a substantial possibility of survival was *not* recognized by the wrongful death statute.[37] Because *Waffen* relied on the erroneous interpretation of Maryland law espoused by the Maryland Court of Special Appeals in *Hetrick v. Weimer*,[38] which was later reversed by the Maryland Court of Appeals in *Weimer v. Hetrick*,[39] we conclude that our opinion in *Waffen* is not a correct interpretation of Maryland law.

Judge McAuliffe's concurrence in *Weimer* indicated that he agreed that a claim for damages for loss of a substantial possibility of survival was inherently inconsistent with the proof of causation of death required in a wrongful death action.[40] How-

---

**31.** We understand the proposition that the deprivation of a substantial possibility of survival is an injury in itself (*i.e.*, the patient's chances of living are diminished). Our point is that the effect would be to relax proof of causation requirements traditionally embraced by medical malpractice tort law.

**32.** 67 Md.App. 522, 508 A.2d 522 (Md.Ct.Spec. App.1986), *rev'd*, 309 Md. 536, 525 A.2d 643 (1987).

**33.** The Maryland Court of Special Appeals is the intermediate appellate court in Maryland. Its rulings are subject to review by the Maryland Court of Appeals.

**34.** 309 Md. 536, 525 A.2d 643 (1987).

**35.** *Id.* at 553, 525 A.2d at 651.

**36.** *Id.* at 554, 525 A.2d at 652.

**37.** The court also stated that damages for wrongful death begin accruing at the death of the decedent. No damages sustained prior to death such as diminished chance of survival are recognized by the statute. *Id.*

**38.** 67 Md.App. 522, 508 A.2d 522.

**39.** 309 Md. 536, 525 A.2d 643.

**40.** *Weimer*, at 555–56, 525 A.2d at 652–53 (McAuliffe, J., concurring).

ever, he opined that there still may exist an independent cause of action for loss of a substantial chance of survival which was not at issue in this case.[41]

*Weimer* left open the question whether the dictum in *Hicks* would later become a brand new cause of action or a new factor in determining damages.[42] In *Cooper v. Hartman*,[43] the Maryland Court of Appeals addressed the question posed in *Weimer* by analyzing it under two separate theories. The first theory involves the new cause of action which claims that the defendant's negligence caused plaintiff to lose a substantial possibility of a successful recovery.[44] The second theory involves a new method of calculating damages that is advocated by Professor King.[45] This new method of calculating damages requires the trier of fact to quantify the amount that the defendant's negligence diminished the patient's chances for avoiding injury

into a fraction. The plaintiff is then awarded damages based on the value of his total injury that is proportional to that quantified fraction.[46]

The court found that the facts of the case did not support the application of either theory.[47] Under both approaches, the plaintiff must prove that the defendant's negligence *probably* caused the plaintiff to lose a substantial possibility of recovery.[48] "Probability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur)." [49] The plaintiff failed to establish a probability of loss, so recovery was denied.[50] In the process, the court refused to endorse or deny the existence of a new cause of action or a new scheme of calculating damages.

After *Cooper* was decided, the courts have interpreted the dicta in *Hicks* as having four different effects. First, some

---

**41.** *Id.* at 556, 525 A.2d at 653.

**42.** *Id.* at 553–54, 525 A.2d at 652.

**43.** 311 Md. 259, 533 A.2d 1294 (1988). This case concerned a plaintiff who did not successfully recover from a disease allegedly because of defendant's negligent medical treatment.

**44.** This cause of action is similar to the one we accepted in *Waffen*. However, we now find that acceptance misplaced in light of *Weimer v. Hetrick*.

**45.** King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353 (1981).

**46.** For example, if the defendant's negligence caused the patient's chances of survival to diminish by 30%, and the patient's life was worth $1,000,000, the jury would award the plaintiff $300,000, *i.e.*, 30% × $1,000,000.

We do not see any substantive distinction between the new cause of action theory and the damage calculation theory. In both instances, the plaintiff must prove that the defendant's breach of duty caused the patient to lose a substantial possibility of survival. The only difference is that under the damage approach the plaintiff is compensated only for the amount that his chances for recovery were diminished. Under the new cause of action approach, the

plaintiff is compensated for the whole resulting injury, regardless of how insignificant defendant's augmentation of the chances for injury may have been.

**47.** *Id.* at 266–67, 533 A.2d at 1297.

**48.** *Id.* at 269, 533 A.2d at 1299.

**49.** *Id.*

**50.** Probability is used in this context differently from its use in *Waffen*. In *Waffen*, we decided that the defendant's negligence need not augment the patient's chances of suffering injury to a probability (*i.e.*, above 50%) to qualify as a loss of substantial possibility. Thus, plaintiff need not prove that the patient would have had a greater than 50% chance of avoiding injury absent negligence. Instead, the lost chance need be not "so insubstantial as to amount to sheer speculation." *Waffen*, 799 F.2d at 922. In the context of *Cooper*, the plaintiff must prove that the defendant's negligence probably caused (had a greater than 50% chance of causing) the chances for injury to be augmented.

Therefore, in *Waffen*, probability is used to describe the amount to which the defendant's negligence must augment plaintiff's chances for injury. In *Cooper*, probability is used to describe the quantum of proof required to prove causation.

cases have not recognized *Hicks* as having any effect on the law of negligence; leaving traditional causation principles unchanged.[51] Second, other cases have indicated that *Hicks* has relaxed proof of causation requirements.[52] Third, cases have concluded that *Hicks* instituted a brand new cause of action entitled deprivation of a substantial possibility of survival.[53] Lastly, some have theorized that *Hicks* instituted that same new cause of action, but made damage recovery proportional to the defendant's augmentation of the chances for injury.[54]

The Court of Appeals of Maryland recently tried to clarify its position on the substantial possibility of survival in *Fennell v. Southern Maryland Hospital Center, Inc.*[55] Affidavits alleged that had the defendant treated the patient in accordance with the appropriate standard of care, she would have maintained a 40% chance of survival. The plaintiff brought two causes of action: one based on the wrongful death statute and one based on the survival statute. The trial court granted defendant's motion for summary judgment on both counts. Recognizing that *Weimer* is dispositive of the wrongful death claim based on loss of chance, plaintiffs only appealed the survival action.

As we have above, the court characterized the *new* theories of interpreting the *Hicks* dicta in three different ways: as a relaxation of the causation requirements, as a new cause of action, and as a different way of calculating damages. The court categorized the three theories presumably from the perspective of damages. The court placed the relaxation of causation requirements and the new cause of action theories in the same category because, in both, the plaintiff asserts that he is entitled to full compensatory damages. The other theory which implements a new method of calculating damages was placed in its own category because the plaintiff asserts his entitlement to only part of the total damages compensable for death.[56] The relaxed causation and the new cause of action issues were not before the court because the plaintiff only requested partial compensation, which invokes only the new calculation of damages theory. However the court did express its opinion on the relaxed causation and the new cause of action theories. Because we may only interpret Maryland law,[57] we conclude that the opinion of the Maryland Court of Appeals on those two theories is pertinent to our decision.

The court acknowledged that *Hicks* was dicta and that it was unfair to award a full recovery when the plaintiff only establishes that it was a substantial possibility that the doctor's negligence caused the injury. "We are unwilling to relax traditional rules of causation and create a new tort allowing full recovery for causing death by causing a loss of less than 50% chance of survival."[58] The plaintiff must prove proximate cause by demonstrating by a preponderance of the evidence that "it is more probable than not that defendant's act caused his injury."[59]

The court went on to analyze the new theory of calculating damages which was

51. *E.g., Weimer,* 309 Md. 536, 525 A.2d 643.

52. *E.g., Thomas,* 265 Md. 84, 288 A.2d 379.

53. *E.g., Waffen,* 799 F.2d 911.

54. King, *supra,* note 45.

55. 320 Md. 776, 580 A.2d 206 (1990).

56. From the perspective of causative injury, the new cause of action and the new calculation of damages theories would go in the same category because the injury caused in both is the loss of a substantial possibility of survival. The injury that must be established under the relaxed causation theory is not the loss of a chance, but an actual injury such as death or impaired recovery.

57. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

58. 320 Md. at 786–87, 580 A.2d at 211.

59. *Id.* at 787, 580 A.2d at 211 (quoting *Peterson,* 258 Md. at 17, 264 A.2d at 855).

squarely at issue before the court. "[W]hen we strip away all the rhetoric, damages are really being awarded for the possibility that the negligence was the cause of death." [60] Because Maryland law clearly does not allow damages based on mere possibilities, the court concluded that it should not institute a new theory of calculating damages.[61]

*Fennell* is the most representative statement of Maryland law on the loss of a substantial possibility doctrine to date. Although the new cause of action and relaxed causation theories were not squarely at issue before the court in *Fennell*, we as interpreters of Maryland law must rely on the dicta as the latest statement of Maryland law. Six out of seven judges concluded that the new cause of action and relaxed causation theories were not viable in a survival statutory claim. Four of seven judges concluded that the two theories were not viable in a wrongful death statutory claim. Therefore, a majority viewed the new cause of action and relaxed causation theories as unrecognized under Maryland law.

The tally on the new damage theory is not exactly clear, but *at least* three of seven judges in the plurality believe that it is not recognized under Maryland law. Judge McAuliffe among others felt that damages awarded for the amount that the defendant's negligence diminished a patient's chances for survival should be cognizable under the Maryland wrongful death statute.[62] However, Judge McAuliffe expressed that such a change must be inau-

gurated by the legislature, not the judiciary.[63] Therefore, four of seven judges opined that the law of Maryland does not recognize the new calculation of damages theory.

## CONCLUSION

It is our conclusion that *Hicks* was not intended to modify the law of medical malpractice. Moreover, our conclusion in *Waffen* was based on an expunged interpretation of Maryland law and does not merit consideration as accurate precedent. The exposition of opinions in *Fennell* indicates that Maryland does not embrace any change in its medical malpractice law precipitated by the misconstruction of the dicta found in *Hicks*.

In order to establish the causation element in a medical negligence cause of action, plaintiff must show by a preponderance of the evidence that the defendant's breach of duty caused the patient to suffer an injury. Therefore, appellant's claim that appellee's negligence deprived him of a substantial possibility of a successful recovery is a claim not recognized under Maryland law and therefore must fail. We affirm.

**AFFIRMED.**

**60.** *Id.* at 790, 580 A.2d at 213.

**61.** *Id.* at 213, 320 Md. at 790–91.

**62.** *Id.* at 795, 580 A.2d at 216 (McAuliffe, J., concurring).

**63.** *Id.* at 796, 580 A.2d at 216 (McAuliffe, J. concurring).