**L.V. Elgin LOWMACK, Jr. and Michelle A. Lowmack, as Administrators of the Estate of Mekia E. Lowmack, Deceased, Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION and Century Products Company, Defendants.**

Civil Action No. 2:96cv936.

United States District Court, E.D. Virginia, Norfolk Division.

June 18, 1997.

Robert J. Haddad, Shuttleworth, Ruloff & Giordano, Virginia Beach, VA, for Plaintiffs.

James W. Morris, III, Lynne Jones Blain, Michelle P. Wiltshire, Morris and Morris, Richmond, VA, for Defendant Century Products Company.

## OPINION & ORDER

PRINCE, United States Magistrate Judge.

### Nature of the Case

This action is brought by L.V. Elgin Lowmack, Jr. and Michelle A. Lowmack, as Administrators of the Estate of Mekia E. Lowmack, Deceased, plaintiffs ("Lowmack"), against Century Products Company, defendant ("Century"), the manufacturer of a Child Restraint System ("CRS"), or car seat, for the wrongful death of Mekia, who was 22 months old at the time of her death, on October 11, 1994, in an automobile accident.[1] Jurisdiction is based upon diversity of citizenship.[2]

It is alleged that Michelle Lowmack was operating a 1994 Pontiac Grand Am with Mekia riding in the back seat of the car in the CRS. Mr. Lowmack was a front seat passenger. Ms. Lowmack lost control of the car, and while it was out of control "the CRS in which Mekia was strapped came loose from its position (although the seat belt itself never unlatched or became disengaged), and allowed the infant to be tossed around the car, while still strapped within the CRS, to such an extent that the infant suffered a broken neck [,which caused her death]." ¶ 15. It is alleged that "[b]ut for the fact that the CRS came loose from its original position ... the infant plaintiff [sic] would have survived the accident." ¶ 19. Century's negligence is alleged to have been in its design of the CRS,

which made it defective and unreasonably dangerous to use, and in failing to adequately warn users of the dangers. Mekia's death "was proximately caused by the defect in the CRS ... [and] as a result [she] died in the automobile accident." ¶¶ 42–43. Damages of $8,425,227, "plus all damages provided by the [Virginia Wrongful Death Act]" are claimed.

### Issues

Century filed a motion for summary judgment based on two grounds: 1) that plaintiffs' evidence is insufficient to prove that the vehicle seat belt in the back, which was used to restrain the car seat, loosened during the accident;[3] and 2) plaintiffs' evidence is insufficient to prove that the defect in the car seat, even if a loosening occurred, was a proximate cause of Mekia's death.[4]

### Facts Concerning the Loosening

■ Mr. Lowmack testified that when the car came to a stop on its roof, he saw his daughter "dangling in front of me." (Docket # 10, Ex. 10 (Elgin Lowmack Deposition), p. 21.) For the following eighteen pages of his deposition, Mr. Lowmack described what he saw of the car seat in sufficient detail to permit a jury, after considering its weight and credibility, to conclude that the restraining belt had loosened during the course of the accident.

1. The Complaint, ¶ 9, alleges that it is brought pursuant to "Virginia Code § 8.01–50 [the Virginia Wrongful Death Act], and the common law." The action was also against General Motors Corporation, but that claim has been settled and awaits dismissal.

2. The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

3. Century concedes that plaintiffs' evidence with regard to a defect in the car seat is sufficient to defeat a motion for summary judgment on that ground. Century's Reply Memorandum in Support of Its Motion For Summary Judgment, n. 1. In other words, Century concedes sufficient evidence to prove a defect that could cause a loosening of the restraining vehicle belt, but bases its motion on a lack of evidence that a loosening occurred.

4. The evidence of the accident is that on a four lane highway, divided by a 54 foot grassy median, the Pontiac, traveling about 55 miles per hour in the eastbound left lane, swerved left onto the three foot paved shoulder to avoid being struck by a truck on its right, traveled about 125 feet on and partially over the shoulder, returned to the left lane fishtailing to the right for about 175 feet, swerved left again and crossed the 54 foot median while traveling eastbound for about 150 feet within the median and in a right sided fishtail, crossed the three foot paved shoulder of the westbound left lane, the two westbound lanes (approximately 24 feet wide) and the six foot paved right shoulder while regaining a more straight forward movement, struck the embankment of a ditch on the north side of the westbound lanes, then a tree, and came to a stop on its roof. Century's Memorandum in Support of Its Motion For Summary Judgment (hereinafter, Docket # 10), Ex. 11, Collision Scene, Tyner Engineering Co.

In addition, there is the testimony of George W. Pearsall, Ph.D., Professor of Mechanical Engineering and Material Science at Duke University, an expert in product safety and design.[5] He stated that he would express opinions "about the kinds of forces that could be involved, because that's an important part of any design engineer's responsibility, to design to prevent death." (Docket # 10, Ex. 12 (Pearsall Deposition), p. 38.) Dr. Pearsall stated that during the accident "when the car went out of control and fishtailed to the right and then was corrected so that it—the rear of the car swung to the left" (*id.* at 66), sufficient forces were exerted on the car seat to cause the vehicle restraining belt to loosen somewhere in the neighborhood of 10 to 14 inches.[6] (*Id.* at 66–67.) His opinion that the belt loosened was based upon evidence of plastic transfer on the webbing of the belt from the car seat. (*Id.* at 66–70). This transfer was caused by the belt literally melting as it slid through the car seat after loosening. (*Id.* at 66–70.) He said that a playout of the belt of as little as three inches would be enough to lose restraining capability. (*Id.* at 72.) The belt loosening occurred over a short period of time, from a fraction of a second to a few seconds. (*Id.* at 136.)

It is the opinion of the Court that the combined testimony of Mr. Lowmack and Dr. Pearsall is sufficient to create a genuine issue of material fact as to whether the vehicle seat belt used to restrain the car seat loosened during the accident, and that summary judgment should not be granted on the first ground stated.[7]

### Allegations and Facts Concerning the Cause of Death

As stated earlier, it is alleged in ¶ 19 of the Complaint that "[b]ut for the fact that the

CRS came loose from its original position . . . [Mekia] would have survived the accident"; in ¶ 42, that "[t]he death of plaintiffs' decedent was proximately caused by the defect in the CRS manufactured by [Century]"; and in ¶ 43, that "[a]s a direct result of the combined negligence of the defendants, GM and Century, the plaintiffs' decedent died in the automobile accident."

In Plaintiffs' Brief in Opposition to the Defendant's Motion for Summary Judgment (Docket # 14), they argue that they have "presented evidence that the failure of Century in any one or more of these particulars more likely than not caused the death of Mekia Lowmack" (*id.* at 7); that "the plaintiffs have clearly proffered testimony and evidence that as a direct result of [Century's] failures as set out above, the death of Mekia Lowmack occurred (*id.* at 8); and that the plaintiff[s have] established through expert and factual testimony the following: . . . (6) As a direct result of the problems set out above, the infant Mekia Lowmack died in this automobile accident." (*Id.* at 8.)

Plaintiffs directed the Court's attention in their brief to Prof. Pearsall's testimony of causation as follows:

[T]he plaintiff[s] will present testimony that, as a direct result of [the defect], the car seat in this case failed, and Mekia Lowmack died. Specifically, the plaintiffs' expert testimony will be:

QUESTION: Is it your opinion that if the [defect did not exist] . . . that Mekia Lowmack would be alive today?

ANSWER: Probably, yes.

QUESTION: Tell me why you think that.

ANSWER: Because I think if that had been the case, better than 50/50 probability, that the seat would have been retained by the seat belt, and under those circumstances, I think the proba-

---

**5.** Century questions Dr. Pearsall's qualifications because he has no experience in the field of CRS design. Without indicating that he would be permitted to express his opinions at a trial of this case, there has been no motion to exclude his testimony for summary judgment purposes and it will be considered.

**6.** Pearsall's deposition concerning the alleged design defect and the mechanics of how forces could cause the restraining belt to loosen was

extensive. It would serve no purpose here to recount that evidence, because Century concedes the sufficiency of the evidence as to design defect for summary judgment purposes.

**7.** Century filed the affidavits of David O. McAllister and Thomas P. Duffield expressing the opinions that the car seat was tightly restrained throughout the accident.

bility of a force sufficient to break her neck occurring in the accident drops significantly.

Pearsall tr. at 53.

In explaining why it is his opinion that Mekia's death was caused by the failure of this car seat to be adequately restrained in the car, Dr. Pearsall testified:

At the time the car stopped abruptly ... I guess we get into a semantic question here. The car seat with the child would have been traveling forward with the car. When the car stops abruptly, the car seat keeps traveling forward.

Pearsall tr. at 56.

(Docket # 14, p. 4.)

During oral argument, plaintiffs referred to the testimony of Prof. Pearsall on page 54 of his deposition:

Q. When—when in the course of the accident did the force sufficient to break her neck occur?

A. Most likely when the car seat containing her reached the end of its travel, after the seat belt loosened and then was stopped abruptly by the end of the seat belt.

Q. And what is it that happened to the—to the child at that point that produced the fractured neck, assuming that's what happened?

A. Most likely the inertia of the mass of her head. The head tends to keep on going when the body and the car seat is stopped abruptly, and those acceleration forces are what, most likely, in my opinion, caused her neck to break.

Q. And can you tell me whether or not that phenomenon would occur with the car seat retained against the back of the seat?

A. It's certainly possible. The probability, in my opinion, is much, much less.

Q. Why is that?

A. Because you don't get as high inertia loadings, you don't get as high accelerations when the body is retained in the car seat as opposed to when the body and the car seat are accelerating as kind of unguided missiles inside the car and then abruptly brought to a stop.

Pearsall Dep. at 54–55.

In oral argument, plaintiffs also directed the Court to the testimony of Dr. Michael E. Hurst on page 12 of his deposition. (Century's Reply Memorandum in Support of Its Motion for Summary Judgment (Docket # 15), Ex. 23.) Dr Hurst is the State Medical Examiner called upon to investigate Mekia's death. His deposition was taken by Century, although he was asked one question by plaintiffs as follows:

Q. Doctor, I have one or two. Would you agree with me that the chance of a child suffering a broken neck would significantly increase if the car seat in which she was strapped in came loose within the car and was no longer tightly strapped against the back seat?

A. Certainly.[8]

Pages 54–55 of the deposition of Prof. Pearsall, and page 12 of the deposition of Dr. Hurst, were not referred to in plaintiffs' memorandum. These parts of the depositions were identified in oral argument in connection with two Virginia cases not cited in plaintiffs' memorandum,[9] and a theory of causation also not advanced by plaintiffs in their memorandum.[10] This theory, recognized in medical malpractice death cases in Virginia, is that proof of a significant loss of chance of survival can be substituted for proof of probable cause that defendant's negligence caused the injury.[11]

Before discussing this theory of proximate cause, there is other testimony of Dr. Hurst and Prof. Pearsall that should be noted. Dr. Hurst stated that no autopsy was performed.

---

8. Defendant objected to the question on the ground that Dr. Hurst had not been designated by plaintiffs to offer such an opinion in the case.

9. *Hadeed v. Medic–24, Ltd.,* 237 Va. 277, 377 S.E.2d 589 (1989); *Brown v. Koulizakis,* 229 Va. 524, 331 S.E.2d 440 (1985).

10. Plaintiffs disagree that this theory of causation was not advanced in their memorandum.

11. Whether this theory of proximate cause is a new position added during oral arguments may be decided by contrasting it with the allegation in ¶ 19 of the Complaint that "[b]ut for" the loosening of the seat belt Mekia would have survived.

Instead, there was a head-to-toe examination of Mekia's body surfaces. No bruises or external injuries were observed, but when he flexed her neck he felt "some crepitus or bone against bone grinding." (Hurst Dep. 7.) He concluded that she had a fracture of the cervical spine, but that there was no way to tell at what level the fracture occurred. He made no conclusions concerning what had caused the fracture. Asked if he had an opinion whether whatever the car seat defect was alleged was a proximate cause of the fracture, he said: "I don't think I can say that; because of the severity of the accident, I don't think I can strongly say that there was a failure that could have within a reasonable degree of certainty caused the death. I'm just not sure." (Hurst Dep. 8.) Dr. Hurst stated that a quick death would most likely be caused by a fracture "that's above C3 or so," (Hurst Dep. 9), but one lower could also cause the death, and he could not say which it was.

Prof. Pearsall stated that he had no basis for an understanding of what the cause of death was other than what he had been told. He added: "but I will say that it's consistent with what I would expect if a child in a child seat is—if the child seat is capable of moving when the car is impacted and then suddenly being stopped when the child seat came to the end of the seat belt, this is certainly not a surprising result." (Pearsall Dep. 42.) He also said that he had no opinion of when the injury occurred, what the injury was other than what he was told, or at what level of the neck it occurred. (Id. at 42–43.) Other than what the injury was, he thought it insignificant as to when the injury occurred or at what level was the fracture. He could not say if the forces exerted on Mekia before the car flipped over were sufficient to break her neck, but "everything seems consistent with that." (Pearsall Dep. 145.) Earlier in his deposition, he had said:

Q. Can you tell me how much acceleration and inertia are required to produce the injury that resulted in Mekia Lowmack's death?

A. No. I don't know where it was located on the cervical spine, don't know what the direction was. I'd anticipate that it was

flexion, but without having x-rays or anything, I can't—I can't speculate.

Q. It could be extension?

A. It could be; not as likely, in my opinion.

### Discussion

During oral arguments, plaintiffs' counsel stated that they do not contend that their evidence is sufficient to prove that Mekia's death was proximately caused by the defective car seat under the ordinary definition of proximate cause: "A proximate cause of an accident, injury, or damage is a cause which in natural and continuous sequence produces the accident, injury, or damage. It is a cause without which the accident, injury, or damage would not have occurred." Virginia Model Jury Instruction No. 5.000; approved in *Blondel v. Hays*, 241 Va. 467, 403 S.E.2d 340, 344 (1991). Devitt, Blackmar and Wolff, Federal Jury Practice and Instructions, § 80.18, defines proximate cause as follows:

An injury or damage is proximately caused by an act, or a failure to act, whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.

Instead, plaintiffs contend that their proof of proximate cause is established by their evidence from Prof. Pearsall that the defective car seat caused a significant loss of a chance of survival. For this argument they cite *Hadeed v. Medic–24, Ltd.*, 237 Va. 277, 377 S.E.2d 589 (1989), and *Brown v. Koulizakis*, 229 Va. 524, 331 S.E.2d 440 (1985).

In *Brown*, the Supreme Court of Virginia stated:

In medical malpractice cases, as in other negligence actions, the plaintiff must establish not only that the defendant violated the applicable standard of care, and was therefore negligent, he must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death. Thus, in a death case, if a defendant physician, by action or inaction, has destroyed any substantial possibility of

the patient's survival, such conduct becomes a proximate cause of the patient's death. The law does not require the plaintiff to prove to a certainty that the patient would have lived had he received more prompt diagnosis and treatment for the condition causing the death. *Whitfield v. Whittaker Memorial Hospital*, 210 Va. 176, 184, 169 S.E.2d 563, 568–69 (1969).

*Id.* 331 S.E.2d at 446.

*Brown* was followed by the Supreme Court of Virginia in *Hadeed*. In *Blondel v. Hays*, 241 Va. 467, 403 S.E.2d 340, 344 (1991), the court explained *Whitfield, Brown,* and *Hadeed* as employing "a decisional standard for the guidance of trial courts in deciding a motion to strike the evidence[, because] if a plaintiff's evidence has shown that the defendant's negligence has destroyed any possibility of the patient's survival, then there is sufficient evidence of proximate cause to go to the jury, and a motion to strike the evidence should be overruled." *Blondel*, 403 S.E.2d at 344. *See also Dolwick v. Leech*, 800 F.Supp. 321, 327 (E.D.Va.1992).

The Supreme Court of Virginia first established this relaxed proof of proximate cause in *Whitfield v. Whittaker Memorial Hospital*, 210 Va. 176, 169 S.E.2d 563 (1969), citing *Hicks v. United States*, 368 F.2d 626 (4th Cir.1966), *Gardner v. National Bulk Carriers, Inc.*, 310 F.2d 284 (4th Cir.1962), and *Harvey v. Silber*, 300 Mich. 510, 2 N.W.2d 483, 488 (1942). *Hicks* is apparently the genesis for this "lost chance" theory. *See Hurley v. U.S.*, 923 F.2d 1091, 1093 (4th Cir.1991); *Waffen v. U.S. Dept. of Health & Human Services*, 799 F.2d 911, 915 (4th Cir. 1986); *Holton v. Memorial Hospital*, 223 Ill.Dec. 429, 223 Ill.Dec. 429, 679 N.E.2d 1202 (1997).

In *Hicks*, a medical malpractice death case, the court stated in *dicta* that:

When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly.

*Hicks*, 368 F.2d at 632 (citing *Harvey v. Silber*, 300 Mich. 510, 2 N.W.2d 483 (1942)).

In the Fourth Circuit, *Hicks* has had an interesting and varying influence. *Hicks* was a medical malpractice-wrongful death action brought under the Federal Tort Claims Act applying Virginia law. Although citing *Harvey* for its dicta, the court said that *Gardner v. National Bulk Carriers, Inc.*, 310 F.2d 284 (4th Cir.1962), was an apt analogy. There, a seaman was discovered to be missing from a moving vessel five hours after he was last seen. The master of the vessel did not alter the speed or course of the vessel or take other steps to find him. The Fourth Circuit reversed the trial judge who found that there was no causal connection between the failure to conduct a search and the seaman's death, holding that the master's duty to attempt a rescue

is of such a nature that its omission will contribute to cause the seaman's death. The duty arises when there is a reasonable possibility of rescue. Proximate cause is tested by the same standard, i.e., *causation is proved if the master's omission destroys the reasonable possibility of rescue.* Therefore, proximate cause here is implicit in the breach of duty.

*Hicks*, 368 F.2d at 633 (citations omitted) (emphasis in original)

Twenty years after *Hicks*, in *Waffen v. U.S. Dept. of Health & Human Services*, 799 F.2d 911 (4th Cir.1986), the court was faced with a medical malpractice action filed in this district, but applying Maryland law. By then, the proximate cause rule of *Hicks* had been approved in Maryland in *Thomas v. Corso*, 265 Md. 84, 288 A.2d 379, 390 (1972) and *Hetrick v. Weimer*, 67 Md.App. 522, 508 A.2d 522 (1986), and had evolved into a separate cause of action for negligence diminish-

ing any substantial possibility of recovery.[12] The district court in *Waffen* held that there was a cause of action under Maryland law for negligence diminishing any substantial possibility of recovery, but it also held that plaintiff had failed to prove causation. The Fourth Circuit recognized the separate issues and said that "[t]he elements of the cause of action which are in dispute, and on which we must focus, are those including 'harm' and 'causation.'" *Waffen*, 799 F.2d at 915. After discussing *Hicks*, *Corso*, and *Hetrick*, the court announced that "we make explicit that under the law of this circuit, and in particular of the State of Maryland, the loss of a substantial chance of survival is a cognizable harm." *Id.* at 917. The court elaborated as follows:

> What was significant about *Hicks*, *Corso*, and *Hetrick* was their affirmation that a certain kind of harm (the loss of a "substantial possibility of survival") could be actionable. A cause of action based on a loss of survival could now be brought and compensation awarded. Defendant argues that the district court has relied upon "dicta" in *Hicks* to adopt a lesser standard of proof of causation, based only on a "possibility." We believe defendant confuses causation and harm. After *Hicks*, the plaintiff's burden of proving causation by a preponderance of the evidence is not lessened, but the plaintiff may now recover damages for showing such causation of a new kind of *harm:* loss of a substantial possibility of survival.

**12.** Whether this evolution began with the *dicta* in Hicks or afterwards is disputed. In *Waffen*, the court said that "[t]he recognition of a cause of action for a loss of a substantial possibility of survival [was] first articulated in *Hicks*." *Waffen*, 799 F.2d at 917.

**13.** This refinement of the rule in *Hicks* is totally contrary to the adoption and utilization of the rule by the Supreme Court of Virginia in its cases, and as explained in *Blondel v. Hays*, 241 Va. 467, 403 S.E.2d 340 (1991).

**14.** The twist put on *Hicks* in *Waffen* was recognized and rejected as reflecting Virginia law in *Irby v. Richmond Pediatric Assocs.*, 16 Va. Cir. 383 (1989), decided in a well-reasoned opinion by Judge Johnson of the Circuit Court of the City of Richmond. He said: "Any doubt as to whether the Fourth Circuit intended its holding in

*Id.* at 918 (emphasis in original).[13] The court then went on to affirm the district court's finding that plaintiff had failed to prove that defendant's negligence in delaying treatment substantially reduced her chance of survival.[14]

In *Hurley v. U.S.*, 923 F.2d 1091 (4th Cir.1991), the court was asked to decide if Maryland law recognized a cause of action for "loss of a substantial possibility of successful recovery," i.e., the impairment of recovery caused by negligence. (In *Waffen*, the claim was for the "loss of a substantial possibility of survival." Plaintiff Waffen concededly suffered cancer without any hope of recovery.) The court said that both causes of action are very similar and they would be discussed intermittently in the analysis of case history, which the court then undertook. The analysis began with the statement that the dicta in *Hicks* "precipitated misunderstanding throughout the courts." *Id.* at 1093. The *Hurley* court stated that the *Gardner* case was not at all analogous to the medical malpractice situation in *Hicks*, despite the fact that the *Hicks* court had found it to be an apt analogy. In fact, the court stated that:

> *Gardner* only concerns a specialized duty peculiar to admiralty law which imposes liability on a highly culpable ship master through a relaxed causation requirement. Such a specialized duty with a "watered-down" causation requirement should not be extended from the high seas to the hospital bed.[15]

*Hicks* to be interpreted simply as a statement of the standard of proof of causation or as the recognition of a separate cause of action was completely erased in *Waffen*." *Id.* at 385. After discussing *Hicks*, *Whitfield* and *Brown*, the court stated that the Supreme Court of Virginia did not recognize in *Hicks* a new cause of action, and then held that Virginia has not recognized loss of chance as a separate cause of action, but only as an evidentiary tool for determining if a plaintiff can survive a motion to strike for failing to prove causation. *Id.* at 386–87.

**15.** In a footnote, the *Hurley* court stated that the ship master's degree of culpability was "more extreme than negligence and just short of intent on the culpability continuum." *Id.* at n. 21.

*Id.* at 1095. As a consequence, the court interpreted "substantial possibility" to be tantamount to a probability, and concluded that *Hicks* made no change to the law that requires proof of proximate cause to prove medical malpractice. *Id.* The court concluded that "*Hicks* was not intended to modify the law of medical malpractice." *Id.* at 1099.[16]

Howsoever the *Hurley* Court's reinterpretation of *Hicks* led it to affirm the trial court's decision that Maryland did not recognize a cause of action for a substantial possibility of a successful recovery, it does not affect the law of Virginia that in a medical malpractice death case, "if a defendant physician, by action or inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death." *Brown v. Koulizakis,* 229 Va. 524, 331 S.E.2d 440 (1989).[17]

Having said all of that, the question comes down to this: Is the decisional standard announced in *Whitfield, Brown* and *Hadeed,* and examined in those contexts in *Blondel* limited to medical malpractice cases? If so, plaintiffs' claim must fail; if not, it should survive. *Whitfield, Brown, Hadeed,* and *Blondel* were medical malpractice death cases. In *Whitfield,* the court speaks of physician negligence that has "effectively terminated a person's chance of survival." 169 S.E.2d at 568. In *Brown,* the court said that "in a death case, if a defendant physician, by action or inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death." 331 S.E.2d at 446. This was repeated in *Hadeed.* 377 S.E.2d at 593–94. In *Blondel,* the court said: "The plaintiff correctly points out that our decisions have stated emphatically, in medical malpractice-wrongful death cases, that a defendant physician's destruction of 'any substantial possibility of the patient's survival' is

'a proximate cause of the patient's death.'" 403 S.E.2d at 343 (emphasis in original).

In the case at bar, plaintiffs argue that the relaxed standard applies in all tort actions, because in *Brown* the Supreme Court of Virginia stated that "[i]n medical malpractice cases, *as in other negligence actions,* the plaintiff must establish" both negligence and proximate cause. *Id.* at 445–46 (emphasis added). From this statement plaintiffs argue that the relaxed standard applies in medical malpractice and other negligence actions. In doing so they have misread the *Brown* line of cases. Those cases stand for no more than that in all negligence cases plaintiffs must prove proximate cause, but that in medical malpractice-wrongful death cases the evidence is sufficient for the case to go to the jury if the evidence of negligence shows no more than that defendant's negligence has destroyed any substantial possibility of the patient's survival. In other words, in medical malpractice-wrongful death cases, evidence of the destruction of any substantial possibility of survival is sufficient evidence of proximate cause to go to the jury. In those cases, the jury should be instructed in the standard definition of proximate cause, in which case "the plaintiff's theory of the case could have been readily established by proof that the defendant physician's negligence was a proximate cause of the patient's death because, in the absence of that negligence, her death would not have occurred when it did." *Blondel v. Hays,* 403 S.E.2d 340, 344.

### Conclusion

Plaintiffs' evidence is insufficient to prove that the defect in the car seat was a proximate cause of Mekia's death, as proximate cause is traditionally used in Virginia. They have conceded this. The law of Virginia does not recognize a proof of proximate cause of a death by a proof of a substantial or significant loss of a chance of survival that is less

---

**16.** In addition, the court held that in *Waffen* it had relied upon the erroneous interpretation of Maryland law espoused in *Hetrick v. Weimer,* 67 Md.App. 522, 508 A.2d 522 (1986), which was later reversed by the Maryland Court of Appeals, 309 Md. 536, 525 A.2d 643 (1987), resulting in an incorrect interpretation of Maryland law in *Waffen.*

**17.** Nor does the decision that "a substantial possibility" as interpreted by *Hurley* to be a probability mean that the same phrase in *Brown, Hadeed,* and *Blondel* has changed the law in Virginia as announced in them.

than a proximate cause, which is defined as a cause without which the death would not have occurred.

### ORDER

It is ORDERED that defendant Century's motion for summary judgment be GRANTED, and that plaintiffs' complaint be DISMISSED.