937 A.2d 861

Charles MARCANTONIO Personal Representative
of The Estate of Sherri Schaefer, et al.

v.

Melissa MOEN, et al.

No. 1428, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Dec. 24, 2007.

Jack A. Gold, Rockville (Lawrence S. Lapidus, Washington, DC and Anthony G. Newman, Bethesda), on the brief, for appellant.

Thomas C. Marriner, Annapolis and Marianne D. Plant, Baltimore (Craig B. Merkle, Baltimore, A. Gwynn Bowie, Jr., Annapolis, Catherine W. Steiner, Towson), on the brief, for appellee.

Panel: SALMON, JAMES R. EYLER and MEREDITH, JJ.

SALMON, J.

This case arises out of a survivorship/wrongful-death lawsuit in which summary judgment was granted in favor of the defendants who are healthcare providers. According to the plaintiff's evidence, the decedent's chance of survival from cancer was eighty percent on the date of the alleged malpractice (failure to order appropriate test and failure to correctly interpret a sonogram) and fifty to sixty percent when appropriate treatment began. The major issue to be decided is whether proof that a healthcare provider was responsible for a twenty- to thirty-percent reduction in the decedent's chance of survival is sufficient to prove that the malpractice caused the death.[1] We shall hold that it is not.

---

1.  Before the motions court, the plaintiff-appellant never contended that the injury at issue was anything other than death. Unlike some survivorship cases, the plaintiff-appellant, for instance, did not try to convince the motions court that the decedent's suffering was prolonged or that cost of treatment increased because of any act of malpractice. Appellant simply argued that appellees' negligence caused the decedent's death.

## I.

Sherri Schaefer was diagnosed with cancer on April 27, 2001. Beginning in May 2001, Ms. Schaefer was treated for that disease at The Johns Hopkins Hospital in Baltimore. The treatment ultimately was unsuccessful, and she died of cancer on May 18, 2005.

About six months before her death, Ms. Schaefer and her husband, Charles Marcantonio, brought a medical malpractice suit in the Circuit Court for Anne Arundel County against Dr. Melissa Moen, a gynecologist, and the corporation for whom she was acting as an agent, i.e., Women's OB/GYN, P.A. In their suit, plaintiffs also named as defendants Dr. Paula A. Decandido, a radiologist, and Dr. Decandido's employer, Anne Arundel Medical Center, Inc.

Shortly after Ms. Schaefer's death, her husband, individually and as personal representative of Ms. Schaefer's estate, filed an amended complaint in which he asserted survivorship and wrongful-death claims against the defendants.

The defendants filed a joint motion for summary judgment about eighteen months after the original complaint was filed. The motion was supported by deposition excerpts from three of the expert witnesses named by the plaintiff. The basis for the summary judgment motion was that, according to the defendants, the plaintiff could not prove that any act of negligence on the part of any defendant proximately caused Ms. Schaefer's death.

The plaintiff filed a timely opposition to the motion that was supported by additional deposition excerpts, together with two affidavits. One affidavit was from Dr. Francis Hutchins, a gynecologist, and the second was from Dr. Barry Shmookler, a pathologist.

Counsel for Dr. Moen and Women's OB/GYN, P.A., the defendants against whom Dr. Hutchins' affidavit was directed, filed a motion to strike Dr. Hutchins' affidavit on the ground that it was inconsistent with his prior deposition testimony. Anne Arundel Medical Center and Dr. Decandido made an

oral motion to strike the affidavit of Dr. Shmookler at a hearing held on July 27, 2006.

After hearing arguments of counsel, the circuit court struck the affidavits of Dr. Hutchins and Dr. Shmookler because, in the court's view, the affidavits were in conflict with the testimony previously given by affiants at deposition. Additionally, the court granted summary judgment against the plaintiff and in favor of all defendants on the ground that plaintiff could not prove that the negligence of the defendants proximately caused Ms. Schaefer's death.

In this appeal, the plaintiff-appellant claims that the trial court erred in (1) granting summary judgment in favor of the defendants and (2) striking the affidavits of Drs. Hutchins and Shmookler.

## II.

Ms. Schaefer was a gynecological patient of Dr. Moen from 1986 through April 27, 2001. Following the onset of menopause in 2000, Ms. Schaefer was treated by Dr. Moen with cyclic hormone replacement therapy ("HRT"), a treatment that provokes a monthly shedding of the uterine lining. A patient going through menopause will continue to have periodic bleeding resembling a menstrual cycle when undergoing cyclic HRT.

During an office visit on August 27, 2000, Ms. Schaefer complained of heavier than normal vaginal bleeding. Dr. Moen ordered a sonogram to find out the cause of the problem.

The sonogram was performed on September 11, 2000, at Anne Arundel Medical Center and was interpreted by Dr. Decandido. At that point, the sonogram film revealed nothing abnormal in the uterus. Plaintiff alleged in his complaint that Dr. Decandido was liable for medical malpractice because she failed to report a 1.5 cm mass arising from the right ovary that was shown on the sonogram. As to Dr. Decandido and her employer, appellant asserted that, if the 1.5 cm mass had been reported in September 2000 to Dr. Moen, then appropri-

ate additional tests would have been performed that would have resulted in Ms. Schaefer's undergoing a total hysterectomy at that time.

The allegation of medical malpractice against Dr. Moen and Women's OB/GYN, P.A., was that in late August 2000 Dr. Moen should have ordered, but did not, an endometrial biopsy,[2] which is a test to sample the lining of the uterus.[3] Appellant's theory of malpractice against Dr. Moen was that if Dr. Moen had ordered an endometrial biopsy in August of 2000, the biopsy would have shown either overt cancer or complex hyperplasia with atypia.[4] The proper treatment for both of these abnormalities is a total abdominal hysterectomy. The plaintiff claimed in his complaint that if Ms. Schaefer had had a total hysterectomy in September 2000 she would not have died of cancer.

Dr. Moen treated Ms. Schaefer for seven months after she ordered the sonogram. On April 27, 2001, following another episode of heavy vaginal bleeding, Dr. Moen recommended an endometrial biopsy. Ms. Schaefer consented to the biopsy, and it was performed that day in Dr. Moen's office. The biopsy revealed that the patient had endometrial cancer (i.e., uterine cancer).

Shortly after that diagnosis, in early May 2001, Ms. Schaefer underwent treatment provided by Dr. Robert Bristow, a gynecological oncologist.

---

**2.** The word "endometrial" means "[r]elating to or composed of the endometrium." *See* PDR MEDICAL DICTIONARY, *supra*, at 641 (3d ed.2006). The "endometrium" is defined as the "mucus membranes comprising the inner layer of the uterine wall...." *Id.*

**3.** Dr. Moen testified at deposition that she *did* recommend (on August 27, 2000) to Ms. Schaefer that an endometrial biopsy be performed, but Ms. Schaefer declined to have that invasive procedure at that time. Whether such a recommendation was made is a matter of dispute between the parties.

**4.** Hyperplasia means "an increase in the number of abnormal cells in an organ or tissue." *See* PDR MEDICAL DICTIONARY, *supra*, at 925. "Atypia" means "[s]tate of not being typical." *Id.* at 181.

The defendants, in their motion for summary judgment, contended that, in a complex medical malpractice case of this sort, the plaintiff needed a medical expert to prove that the alleged acts of malpractice proximately caused Ms. Schaefer's death. But, according to defendants, the depositions of plaintiff's own experts demonstrated that plaintiff could not prove proximate cause. In support of their motion, the defendants relied upon the deposition testimony of three witnesses named by plaintiff as expert witnesses, i.e., Dr. Robert Bristow, Dr. Francis Hutchins, and Dr. Barry Shmookler.

### III.

#### A. *Deposition of Dr. Robert Bristow*

When Dr. Bristow first saw Ms. Schaefer as a patient in May 2001, she had Stage 3C endometrial cancer. He operated on Ms. Schaefer in June 2001. Thereafter, he was her treating physician at The Johns Hopkins Hospital until her death. According to Dr. Bristow, Ms. Schaefer's cancer treatment was "fairly proactive and aggressive." He testified that, assuming a "fairly proactive and aggressive treatment approach," Ms. Schaefer had, at the time he operated on her in June 2001, a fifty- to sixty-percent chance of survival.

Dr. Bristow's exact testimony in regard to the chances of survival was as follows:

Q. And do you know what the survivability is for patients with 3C endometrial cancer?

A. Yes.

Q. What is that?

A. I mean, in general. Based on our experience and based on the literature.

Q. Based on your experience and the literature, what is the prognosis for 3C endometrial cancer?

A. Well, there's quite a range. It depends on the therapeutic treatment program, in many instances, and so there are some reports in the—in the literature of survivability range anywhere from thirty percent all the way up to

eighty-five percent, *with a general average probably being somewhere in the fifty to sixty-five or seventy-five percent for a five-year survival.* That's assuming a fairly proactive and aggressive treatment approach.

Q. Did Ms. Schaefer get a fairly proactive and aggressive treatment approach?

A. I would say that she did, yes.

Q. In the medical records, there is a note of your discussing with Ms. Schaefer that her chances of survival following the surgery, and assuming she accepted the proactive and aggressive treatment you were recommending, *were in the fifty to sixty percent range.* Is that accurate?

A. I think that's a pretty fair estimate, yes.

(Emphasis added.)

Dr. Bristow was unable to say, one way or the other, whether Ms. Schaefer had metastatic cancer in September of 2000 when the sonogram was performed. In this regard, he said at deposition:

Q. But you're not able to say at what point in time she first had cancer?

A. Well, I can say that we diagnosed it when she had a major surgical operation here, and as I said, I believe it was in—I think it was in June of 2001. At the advanced stage that her cancer had presented, it had been growing for some period of time prior so that in order to achieve that degree of advanced stage.

Q. Okay.

A. It's very difficult to put a time estimate on how long that would have occurred, because cancers will vary in their growth rate, so it could have been anywhere from months to even years.

Q. Okay. And is it accurate to state that you can't say within reasonable medical probability at what point in time she had metastatic cancer?

A. Other than to say that at the time of the surgery that we did, it was pretty clear that she had metastatic cancer,

but I'm unable to say at what point prior to that the metastatic cancer developed.

Q. So you can't say one way or the other whether she already had metastatic cancer in September of 2000?

A. I think that's a fair statement.

He summed up his opinion when he said later in his deposition that it was possible that in September 2000 she already had metastatic cancer, but it was also possible that she did not.

### B. *Deposition of Dr. Francis Hutchins*

Dr. Hutchins, a gynecologist, testified that by August 25, 2000, the date of the alleged malpractice by Dr. Moen, he believed that if an endometrial biopsy had been done on that date the biopsy would have shown either: (1) simple hyperplasia of the endometrium, (2) complex hyperplasia of the endometrium with atypia, or (3) early overt cancer. According to Dr. Hutchins, if Ms. Schaefer had simple hyperplasia in August of 2000, the appropriate treatment would have been merely to adjust her hormone replacement therapy regime, which Dr. Moen did on August 25, 2000.[5] On the other hand, if the patient had either overt cancer or complex hyperplasia with atypia, the appropriate treatment in early September 2000 would have been total abdominal hysterectomy.

Later in his deposition, Dr. Hutchins testified that, *if* Ms. Schaefer had cancer of the uterus in early September 2000, the cancer was at Stage 1A, and with proper treatment, her chance of being cured at that point was eighty percent.

Dr. Hutchins responded in the negative when he was asked by defense counsel if he would be "rendering an opinion within reasonable medical probability" as to Ms. Schaefer's cause of death.

---

**5.** At deposition, Dr. Hutchins conceded that Dr. Moen adjusted Ms. Schaefer's hormone replacement therapy regime on August 25, 2000, which would have been acceptable treatment if Ms. Schaefer had simple hyperplasia of the endometrium.

## C. *Deposition of Dr. Barry Shmookler*

Dr. Shmookler, a pathologist, testified that the ovarian mass, which Dr. Decandido did not report, was "in all probability" benign on August 27, 2000, but nevertheless the mass was "a precursor to cancer." He also opined that Ms. Schaefer had two primary sites of cancer in May 2001: one site in the endometrium (uterine cancer) and the other in the ovary— and that the two cancers grew independently. He testified that in early September 2000 the tumor in the endometrium was then probably either "atypical hyperplasia [hyperplasia with atypia] or carcinoma *in situ* [cells that are cancerous]." He opined that if Ms. Schaefer's condition had been properly diagnosed in September 2000, "in all medical probability" her "uterine cancer [i.e., the cancer in the endometrium] would have been curable."

Dr. Shmookler's exact testimony in regard to causation was as follows:

Q. Do you have an opinion as to Ms. Schaefer's prognosis at any point in time from August of 2000 through July of 2001?

A. Well, I believe, at the time of the sonogram, the first sonogram, which was ... September of 2000—again, as far as the ovary, as I said, we know there was a complex mass there. We also know that it was one to one and a half centimeters. I believe at that point it was, as I said earlier, a cystadenoma, which is a benign tumor, so there is no chance of metastasis there, and I also mentioned that the endometrial tumor [tumor in the uterus] was in a much earlier state, that it was not invasive, it was probably atypical hyperplasia or maybe carcinoma *in situ*, so I think, *had that been diagnosed in September of 2000, in all medical probability that uterine cancer would have been curable.*

(Emphasis added.)

Dr. Shmookler also said in his deposition that he had no opinion as to Ms. Schaefer's prognosis as of May 2001, which

was the date she commenced receiving appropriate medical treatment from Dr. Bristow.

## IV. *PROCEEDINGS IN THE CIRCUIT COURT*

When the defendants filed their motion for summary judgment, they relied primarily on the cases of *Fennell v. S. Maryland Hosp. Ctr., Inc.*, 320 Md. 776, 580 A.2d 206 (1990), and *Weimer v. Hetrick*, 309 Md. 536, 525 A.2d 643 (1987). Movants also stressed Dr. Bristow's uncontradicted testimony that Ms. Schaefer had a fifty- to sixty-percent chance of survival as of June 2001 when he operated on her. The defendants worded their argument as follows:

> Plaintiff has not produced any expert who can say that the [d]efendants' alleged negligence was the probable cause of Ms. Schaefer's death, because *no expert in this case can or did opine that the [d]efendants deprived Ms. Schaefer of more than a 50% chance of surviving her cancer.* Because it is undisputed that she had a 50–60% chance of survival at the time of her initial surgery, which took place after the occurrence of the alleged medical negligence, it is not possible for any expert to opine that the [d]efendants herein were responsible for a greater than 50% diminution in Ms. Schaefer's prognosis. It is mathematically impossible. Absent such testimony, [p]laintiffs have failed to establish the element of probable cause.

(Emphasis added.)

Counsel for plaintiff countered:

> Defendants' "loss of chance" argument is nothing more than an effort at turning the issue of proximate cause on its head.... [I]t is readily apparent that the instant case is *not* a "loss of chance" case. As already mentioned, "loss of chance" means "decreasing the chance of survival as a result of negligent treatment where the likelihood of recovery from the preexisting disease or injury, *prior to any alleged negligent treatment,* was improbable, i.e., fifty percent or less." *Fennell v. Southern Maryland Hosp. Center, Inc.*, 320 Md. 776, 781 [580 A.2d 206] ... (1990) (emphasis

supplied). *See also Cooper v. Hartman,* 311 Md. 259, 264–65 [533 A.2d 1294] . . . (1987) ("loss of chance" applies in cases where, due to the severity of the patient's preexisting condition, the plaintiff has difficulty proving causation, i.e., difficulty demonstrating "a better than even chance of recovery, absent the malpractice"); *Weimer v. Hetrick,* 309 Md. 536 [525 A.2d 643] . . . (1987) (finding no error in trial court's charge to the jury that, if prior to any malpractice by the defendant the premature infant's chance of survival was 50% or less, the jury must find in favor of the defendant).

*Whatever chance of survival Ms. Schaefer had at the time of the correct diagnosis in May of 2001 is irrelevant for purposes of a "loss of chance" analysis.* Instead, the Court must focus on her prognosis when [d]efendants failed to properly diagnose her condition in August and September of 2000, at which time the evidence demonstrates that, but for [d]efendants' negligence, Ms. Schaefer would have been cured of cancer and would be alive today.[6] *In other words, prior to [d]efendants' negligence the likelihood of recovery from her preexisting condition was **probable** (i.e., much greater than fifty percent).* By contrast, the *Fennell* decedent's likelihood of recovery was **improbable** at the time of the malpractice (i.e., **less** than fifty percent). *Fennell,* 320 Md. at 780 [580 A.2d 206]. *See also Hurley v. United States,* 923 F.2d 1091, 1098 (4th Cir.1991) (with regard to *Fennell,* "had the defendant treated the decedent in accordance with the appropriate standard of care, she would have maintained a 40% chance of survival").

(Emphasis added.)

The motions judge ruled as follows:

The court will grant the defense motions for summary judgment, because I think that the case of *Fennell v. Southern Maryland Hospital,* 320 Md. 776 [580 A.2d 206], is

---

**6.** There was no evidence presented to the motions court demonstrating that, but for the negligence of the defendants, Ms. Schaefer "would be alive today."

controlling in the sense that the plaintiffs ... have not offered evidence that would establish proximate causation of 51 percent or more of the chance of ... survival ... of the decedent, and while it seems to me that the decision of *Fennell* is a harsh one, and almost seems to be unfair, the opinion of the Court of Appeals was to the effect that regardless of how it may seem unfair, that that is what the law and the statute says, and that if the law is going to be changed to permit lost chance of survival, even if it is significant percentage of loss, as long as there is an equal or greater chance of survival *at the time that the critical moment arrives,*[7] then the plaintiff will lose, because it is not sufficient to say that the negligence, whether it is failure to diagnose, failure to treat, or whatever, was the proximate cause of death.

And so I, in this case, join the Court of Appeals in saying that if this seems unfair, the Legislature should change the law, but I think that that is what the law currently is in the State of Maryland, and so those defense motions are granted. We will enter a final judgment in favor of the defendants, and invite the plaintiffs to appeal or to go to the Legislature if they think the law should be different.

(Emphasis added.)

## V.  *ANALYSIS*

Prior to the Court of Appeals decision in *Weimer v. Hetrick*, 309 Md. 536, 525 A.2d 643 (1987), it was believed by at least some authorities that in a wrongful-death action filed in Maryland against a healthcare provider the plaintiff was only required to prove that the healthcare provider's negligence deprived the patient of a substantial chance of survival. *See Hurley v. United States*, 923 F.2d 1091, 1093–1099 (4th Cir. 1991). This Court took that position in *Hetrick v. Weimer*, 67

---

7.  We interpret the phrase "at the time that the critical moment arrives" as used in the motions judge's opinion to mean at the time the decedent began to receive appropriate treatment (May 2001) because that was the critical date—according to movants.

Md.App. 522, 541–43, 508 A.2d 522 (1986), *rev'd,* 309 Md. 536, 525 A.2d 643 (1987), when we interpreted the case of *Thomas v. Corso,* 265 Md. 84, 288 A.2d 379 (1972), as allowing a plaintiff to prove the causation element in a wrongful-death action by demonstrating that the defendant's malpractice deprived the decedent of "a substantial chance of survivorship." 67 Md.App. at 542, 508 A.2d 522.[8]

In *Weimer,* Dr. Stanley Weimer participated in resuscitation efforts provided to a premature infant shortly after the delivery of the baby. *Weimer,* 309 Md. at 539, 525 A.2d 643. Despite the doctor's efforts, the baby died "hours after birth." Plaintiffs' expert testified that, in various ways, Dr. Weimer's resuscitation efforts did not meet the requisite standard of care. *Id.* The expert further opined that if Dr. Weimer's efforts had not been inadequate the likelihood of the infant's survival was "80 to 90" percent. *Id.* at 540, 525 A.2d 643.

In *Weimer,* the jury was instructed as follows:

Now plaintiffs need only prove the most likely cause of the baby's death in addition to everything else that I've said. The plaintiffs are not required to negate or exclude every other possible cause. However, if there are two or more causes, either of which could have resulted in the baby's death, one of which for which the pediatrician is responsible, and the others for which he is not, *then the plaintiffs have to prove by evidence more likely so than not that the acts for which the pediatrician is responsible in fact caused the baby's death.* Now there I've used that phrase by evidence more likely so than not.

---

**8.** A majority of jurisdictions (twenty-four) in this country allow a plaintiff to recover in a wrongful death case based on a loss of a substantial chance of survival; sixteen states (including Maryland) do not recognize the doctrine, and ten have not decided the issue. *See* JAMES LOCKHART, CAUSE OF ACTION FOR MEDICAL MALPRACTICE BASED ON LOSS OF CHANCE OF CURE, 4 Causes of Action 2d 1, 94–102 (1994), and Tory A. Weigand, *Loss of Chance in Medical Malpractice: A Look at Recent Developments,* 70 Def. Couns. J. 301, 305–07 (2003), for a state-by-state analysis.

Take the example in this case, and it is strictly an example, and I don't mean to infer that these are the facts. Again, I'm only doing this to clarify what I've just said. You have to decide what the facts are. But if you should find that Dr. Weimer was responsible for the lack of oxygen and that was 50% of the cause of the death and if you feel that the prematurity was 50% of the cause of death, then that's the standoff again.... There are two possible causes of death that are both equal. If that's the case, the plaintiff hasn't done what the law requires and you must find in favor of the doctor. The plaintiff has to show that the act for which the doctor is responsible ... is better than 50%, 51%. That's better.

*Id.* at 542–43, 525 A.2d 643 (emphasis added).

Counsel for plaintiffs in *Weimer* objected to the foregoing instruction, saying:

Your Honor, in the instructions you failed to give the, or at least I didn't hear it, the instruction on *Thomas v. Corso* [, 265 Md. 84, 288 A.2d 379 (1972),] to the effect that all that plaintiff need prove is that the actions of Dr. Weimer took away a substantial possibility that this baby would have survived with appropriate resuscitation. And, thirdly, Your Honor, I object to giving the instruction that [defense attorney] asked for that said that and with your example where you said 50% prematurity, 50% lack of appropriate resuscitation, I don't think that that is the burden that's upon the plaintiff. I think all that the burden—all that *the plaintiff need prove is that failure to properly resuscitate took away a substantial possibility that this child would have survived. So in this specific case, as in Thomas v. Corso, even though we have offered evidence as to probability, we need only prove substantial possibility which was less than 50%. Thank you, Your Honor.*

*Id.* at 543, 525 A.2d 643 (emphasis added).

The jury found in favor of Dr. Weimer. The primary issue addressed by the Court of Appeals in *Weimer* was whether the trial judge, who presided in a wrongful-death action, erred

when he refused to instruct the jury as requested by plaintiffs' counsel. *Id.* at 543–44, 525 A.2d 643.

The Court of Appeals in *Weimer* reversed this Court and rejected the plaintiffs' argument that, as to the wrongful-death claim, the court should have given the requested instruction concerning whether the defendant had taken away "a substantive possibility that [the baby] would have survived with appropriate resuscitation." *Id.* at 553–54, 525 A.2d 643. The Court also held that there was no error in the trial judge's charge to the jury. *Id.* The *Weimer* Court "left for another day" the question of whether the loss of substantial chance of survival might be cognizable in a survivorship action. *Id.*

The Court of Appeals majority and concurring opinions in *Weimer* were concisely (and accurately) summarized by the United States Court of Appeals for the Fourth Circuit in *Hurley, supra,* as follows:

The [*Weimer* ] court did not believe that the language in both *Hicks* [*v. United States,* 368 F.2d 626 (4th Cir.1966),] and *Thomas* [*v. Corso, supra* ] was designed "to alter, without discussion, the rule of law governing the burden of proof so anciently formed and so uniformly applied in wrongful death cases under the Maryland statute." It is an established principle that a plaintiff must prove the existence of causation by a preponderance of the evidence in any negligence case. The Maryland wrongful death statute can only be invoked "*against a person whose wrongful act caused the death of another.*" *Therefore, a wrongful act which deprived the patient of a substantial possibility of survival was not recognized by the wrongful death statute.*

\* \* \*

Judge McAuliffe's concurrence in *Weimer* indicated that he agreed that a claim for damages for loss of a substantial possibility of survival was inherently inconsistent with the proof of causation of death required in a wrongful death action. However, he opined that there still may exist an

independent cause of action for loss of a substantial chance of survival which was not at issue in this case.

923 F.2d at 1096–97 (footnotes omitted) (some emphasis added).

*Fennell, supra,* was a medical malpractice case that arose as a result of Cora Fennel's death. 320 Md. at 778, 580 A.2d 206. Mrs. Fennel was rushed to the Southern Maryland Hospital and admitted on July 14, 1981. She was declared brain dead a little more than four hours later (*id.* at 779, 580 A.2d 206) and died the next day. *Id.* In a subsequent survivorship suit, the plaintiffs claimed that Mrs. Fennell's doctor had negligently misdiagnosed her condition and, as a result, had treated her for the wrong problem. One of the plaintiffs' experts testified at deposition that if Mrs. Fennell had been diagnosed and treated by the defendants in accordance with the appropriate standard of care, "she would have had a 40% chance of survival." *Id.* at 780, 580 A.2d 206. The circuit court granted summary judgment in favor of the defendants on the basis that the plaintiffs could not prove causation.

On appeal, the plaintiffs in *Fennell* recognized that under the Court of Appeals holding in *Weimer, supra,* they could not prove the causation element necessary to support a wrongful-death action by proof that the malpractice had cost the decedent a forty-percent chance of survival. *Id.* Counsel for the plaintiffs maintained, however, that "the Maryland courts have left open the issue of whether loss of chance is compensable in a survival action where the degree of proof that death was caused by the defendant's negligence does not meet the 'more likely than not' standard." *Id.* at 781, 580 A.2d 206.

In *Fennell,* Judge Chasanow, speaking for the Court, said:

Loss of chance may include loss of chance of a positive or more desirable medical outcome, loss of chance of avoiding some physical injury or disease, or a loss of chance to survive. Because the instant case involves a loss of chance to survive, *when we refer to "loss of chance," we mean decreasing the chance of survival as a result of negligent*

*treatment where the likelihood of recovery from the pre-existing disease or injury, prior to any alleged negligent treatment, was improbable, i.e., 50% or less.*

Negligent treatment resulting in a loss of chance of survival may or may not eliminate all chance of survival or recovery. If the chance of recovery is 40%, as in the instant case, the risk of non-recovery must be 60%; and the loss of the 40% chance of recovery increased the risk of non-recovery to 100%. Thus, the loss of a 40% chance of recovery in this case eliminated all chance of recovery. It is also conceivable that negligent treatment may result in loss of a chance of survival without eliminating all chance of survival. For example, if the patient had a 40% chance of recovery and negligent treatment reduced the patient's chance of survival to 10%, then the actual loss of chance of survival would be 30%. By loss of chance, we mean the net loss of chance of survival directly attributable to the negligence.

Loss of chance medical malpractice actions have been recognized in several other jurisdictions, but the cases do not always clearly state the basis for recognizing the cause of action. A number of jurisdictions have not adopted the loss of chance doctrine, while others have not clearly resolved whether to recognize the doctrine. Still other jurisdictions have refused to recognize the loss of chance doctrine.

*Id.* at 781–82, 580 A.2d 206 (footnotes omitted).

Later in its opinion, the Court said:

Courts adopting the relaxed causation/new cause of action approach continue to award "all or nothing" damages, and when the plaintiff establishes a "substantial possibility" that the doctor's negligence caused the death, there is full recovery. The result is that relaxing the rules of causation merely improves the plaintiff's odds of receiving all rather than nothing.

*Id.* at 784–85, 580 A.2d 206.

The *Fennell* Court rejected the relaxed causation approach, saying:

We are unwilling to relax traditional rules of causation and create a new tort allowing full recovery for causing death by causing a loss of less than 50% chance of survival. In order to demonstrate proximate cause, the burden is on the plaintiff to prove by a preponderance of the evidence that "it is more probable than not that the defendant's act caused his injury." *Peterson v. Underwood,* 258 Md. 9 [264 A.2d 851] . . . (1970).

"This does not mean plaintiff is required to exclude every other possible cause of the accident. But where plaintiff by his own evidence shows two or more equally likely causes of the injury, for only one of which defendant is responsible, plaintiff can not recover."

*Id.* at 17 [264 A.2d 851]. . . .

We might also note that in 1986 the General Assembly enacted Md.Code (1974, 1989 Repl.Vol.), Courts and Judicial Proceedings Article, § 3–2A–04(b)(1)(i), which requires dismissal of a malpractice action "if the claimant fails to file a certificate of a qualified expert with the Director attesting to the departure from standards of care, *and that the departure from standards of care is the proximate cause of the alleged injury* . . ." (emphasis added). This statute may have manifested a legislative intent that there be a preliminary showing of traditional causation as a prerequisite to filing a medical malpractice claim.

*Id.* at 786–87, 580 A.2d 206.

The Court of Appeals in *Fennell* also rejected the approach advocated by Professor Joseph H. King, Jr., in his influential article, *Causation, Valuation and Chance in Personal Injury Torts Involving Pre-existing Conditions and Future Consequences,* 90 Yale L.J. 1353 (1981). King gave the following example:

To illustrate, consider a patient who suffers a heart attack and dies as a result. Assume that the defendant-physician negligently misdiagnosed the patient's condition, but that the patient would have had only a 40% chance of survival even with a timely diagnosis and proper care. Regardless

of whether it could be said that the defendant caused the decedent's death, he caused the loss of a chance, and that chance-interest should be completely redressed in its own right. Under the proposed rule, the plaintiff's compensation for the loss of the victim's chance of surviving the heart attack would be 40% of the compensable value of the victim's life had he survived (including what his earning capacity would otherwise have been in the years following death). The value placed on the patient's life would reflect such factors as his age, health, and earning potential, including the fact that he had suffered the heart attack and the assumption that he had survived it. The 40% computation would be applied to that base figure.

*Id.* at 1382.

The *Fennell* Court said:

While we should not award damages if there is no injury, the logical extension of . . . [King's proposed] loss of chance damages theory arguably should allow loss of chance damages for negligence, even when the patient miraculously recovers. For example, if a doctor negligently treats a person with a 40% chance of recovery and the doctor's negligence reduces the patient's chance of recovery to only 10%, whether the patient lives or dies, the doctor's negligence cost the patient a 30% loss of chance of survival. If the patient dies, the probable cause of death was the pre-existing disease or injury; it is unlikely that the negligence caused the death. If the patient lives, the negligence clearly did not cause the death. In both scenarios, there was negligence resulting in a 30% loss of chance of survival. If courts are going to allow damages solely for the loss of chance of survival, logically there ought to be recovery for the loss of chance regardless of whether the patient succumbs to the unrelated pre-existing medical problem or miraculously recovers despite the negligence and unfavorable odds.

Since loss of chance damages are only permitted when the patient dies, it is also arguable that, when we strip away the rhetoric, damages are really being awarded for the *possibil-*

*ity* that the negligence was a cause of the death. Maryland law clearly does not allow damages based on mere possibilities. *Pennwalt Corp. v. Nasios,* 314 Md. 433, 444 [550 A.2d 1155] . . . (1988). *See also Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656 [464 A.2d 1020] . . . (1983).

320 Md. at 790–91, 580 A.2d 206.

■ In the case at hand, appellant recognizes that the *Fennell* Court rejected the loss of chance doctrine and all its permutations. But appellant stresses that this is not "a loss of chance" case, as defined in *Fennell,* because "loss of chance" means "decreasing the chance of survival as a result of negligent treatment where the likelihood of recovery from the preexisting disease . . ., prior to any alleged negligent treatment was improbable, i.e., 50% or less." *Id.* at 781, 580 A.2d 206. Here, the chance of survival, prior to any act of negligence, was eighty percent according to Dr. Hutchins.[9]

The *Fennell* Court focused upon the issue of whether Maryland would recognize the "loss of chance" doctrine in a survivorship action. Almost all courts that have adopted that doctrine have applied it *only* in situations where there was a "loss of chance" as defined in *Fennell. See* Tory W. Weigand, *Loss of Chance in Medical Malpractice: The Need for Caution,* 87 Mass. L.Rev. 3 (2002); *see also McDermott v. Tweel,* 151 Ohio

---

9. As appellees point out in their brief, there are problems with Dr. Hutchins' expert opinion apart from the "loss of chance" issue. The problem is that he testified that if a biopsy had been performed on August 27, 2000, it would have shown one of three possible conditions. If the biopsy had shown one of those possible conditions (simple hyperplasia of the endometrium), Ms. Schaefer's injury indisputably was not proximately caused by the (alleged) malpractice because she received the correct treatment anyway. This problem, however, is not material for two reasons. First, it was not the reason relied upon by the motions judge. *See Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726 (2001) (an appellate court ordinarily will affirm the grant of summary judgment only on the grounds relied upon by the motions court). Second, Dr. Shmookler opined that in September 2000, Ms. Schaefer's biopsy would have shown either carcinoma *in situ* or hyperplasia with atypia, both of which should have been treated by a total hysterectomy. Because we must take the evidence in the light most favorable to appellant—the non-moving party—we must assume that what Dr. Shmookler said at deposition was true.

App.3d 763, 786 N.E.2d 67, 76 (2003) (loss of chance doctrine inapplicable where decedent's chance of survival was greater than even at time of the alleged malpractice). We therefore agree with the appellant that this is not a "loss of chance" as that term is defined in *Fennell.*[10]

Nevertheless, what was said by the Court of Appeals in *Fennell* and *Weimer* as to proximate cause is highly relevant to this case. To recover under the wrongful-death act, a plaintiff in Maryland must prove that the negligence of the defendant caused the wrongful death of another. *Fennell,* 320 Md. at 790, 580 A.2d 206; *Weimer,* 309 Md. at 554, 525 A.2d 643. Proof, as here, that defendants' negligence reduced the decedent's chance of survival by twenty to thirty percent (i.e., from eighty percent to between fifty and sixty percent) does not show a "probability" that the negligence caused the decedent to die. *See Arredondo v. Rodriguez,* 198 S.W.3d 236, 239 (Tex.App.2006) (recovery in wrongful-death action is barred when the defendant deprives the decedent of a fifty-percent-or-less chance of survival).

The facts in *McDermott v. Tweel, supra,* are closely analogous to those here presented. *McDermott* was a wrongful-death action in which the trial court granted summary judgment in favor of Drs. Tweel and VerMeulen. 786 N.E.2d at

---

**10.** We have found one case that has applied the "loss of chance" doctrine where the chance of survival was seventy-five to eighty percent when the negligence of the hospital occurred and five percent five hours later when the decedent left the hospital's premises. *Jones v. Mercy Health Ctr., Inc.,* 155 P.3d 9, 15 (Okla.2006). In *Jones,* the Court used a definition of the loss of chance doctrine different from that utilized by the Court in *Fennell.* The *Jones* Court said:

In this instance, the uncontradicted evidentiary material establishes that Williams had a 75–80% chance of survival when he walked into the emergency room at Mercy Health Center and less than a 5% chance of survival when he left five hours later and that this change was due to the enema prescribed by [d]efendants. This is precisely the situation contemplated by the "loss of chance" doctrine.

*Id.* at 16.

It is to be noted that under the traditional proximate cause analysis— as adopted in Maryland—the plaintiff in *Jones* would have produced sufficient evidence to prove causation.

71–72. The evidence, taken in the light most favorable to the plaintiff, showed that the delay by Dr. Tweel in sending the decedent to a cancer specialist reduced the decedent's chance of survival from ninety to eighty-five percent. *Id.* at 75. Dr. VerMeulen's negligence (taken in the light most favorable to the nonmoving party) reduced the decedent's chance of survival from seventy-five to fifty percent, a twenty-five-percent loss of chance of recovery. *Id.* The Ohio Court of Appeals upheld the lower court's grant of summary judgment on the basis that the wrongful death plaintiff had failed to prove that it was probable (i.e., more likely than not) that the negligence of either Dr. Tweel or Dr. VerMeulen caused the decedent's death. *Id.* at 76.

In the case at hand, as in *McDermott v. Tweel,* none of the plaintiff's experts testified at deposition that either Drs. Moen or Decandido caused Ms. Schaefer's death, nor can such a causal connection be inferred from the testimony of the experts.

The case of *Volz v. Ledes,* 895 S.W.2d 677 (Tenn.1995), is an example where a state that follows, as does Maryland, the traditional rules of proximate cause, allowed recovery based on a showing that the healthcare providers' negligence reduced the chance of survival by more than fifty percent (sixty percent to five percent). Charles Volz, who had previously been operated on for testicular cancer, went to consult with Dr. Claud Ledes, an oncologist, in September 1989. *Id.* at 678. At that point, Dr. Ledes erroneously told Volz that a mass in Volz's abdomen was scar tissue from a previous operation and that no further treatment was necessary. *Id.* In December of 1989, it was discovered that the mass was a cancerous tumor. *Id.* Surgery was performed immediately by another doctor, but at that point the cancer had spread dramatically. *Id.* Volz was treated with chemotherapy by Dr. Ledes' partner until May 1990, whereupon he was transferred to the care of Dr. Patrick Loehrer. *Id.* When Dr. Loehrer first saw Volz, the patient had only a five-percent chance of survival. *Id.* Plaintiff's expert testified that Dr. Ledes deviated from the recognized standard of care in four ways, viz.:

"(1) he chose the wrong chemotherapy drugs; (2) administered them in improper dosages; (3) as well as at improper intervals[;] and[ ](4) Dr. Ledes improperly diagnosed Volz's recurrent mass as scar tissue rather than tumor." *Id.* According to plaintiff's expert, Volz had a sixty-percent chance of complete recovery in September of 1989 when he was first seen by Dr. Ledes.

In *Volz*, the Tennessee Supreme Court upheld the verdict rendered in favor of the Volz estate, saying:

> [The Tennessee wrongful-death statute] requires that a plaintiff in a medical malpractice action prove that "[a]s a proximate result of the defendant's negligent act or omission [of accepted community medical standards], the plaintiff suffered injuries which would not otherwise have occurred."

> This statutory language is simply another way of expressing the requirement that the injury would not have occurred but for the defendant's negligence, our traditional test for cause in fact.

> *Kilpatrick v. Bryant,* 868 S.W.2d 594, 602 (Tenn.1993). Additionally, causation in medical malpractice cases must be shown as a matter of *probability,* i.e.[,] more likely than not, or greater than a 50 percent chance, that the plaintiff's injuries would not have occurred but for the negligent actions of the defendant(s). *Id.*

> The record reveals that the plaintiffs proffered sufficient proof at trial to establish that the negligence of Dr. Ledes more likely than not was the proximate cause of the death of Robert Volz. Expert medical testimony also established he had a 60 percent chance of complete recovery. Further[,] the plaintiffs offered uncontroverted testimony that the defendant, Dr. Ledes, failed to act in accordance with accepted community standards of medical practice for treatment of the disease from which Volz was suffering. The plaintiffs' proof established, that as a result of the defendant's deviation from such medical standards, Robert Volz suffered a death which otherwise would not have occurred.

Stated another way, the record reveals that it was more likely than not Robert Volz would have survived the cancer but for the defendant's negligent actions.

*Id.* at 679–80.

Dr. Hutchins' testimony showed that two out of ten persons with Ms. Schaefer's condition would have died from cancer even with proper care. At the time appropriate treatment began (according to Dr. Bristow) four or five out of ten would have died from cancer even with appropriate treatment. Thus, the alleged malpractice diminished Ms. Schaefer's chance of survival by, at most, thirty percent. Reduced to its essence, appellant's current position is identical to the position espoused by plaintiff's counsel in *Weimer,* who asked that the jury be instructed, in a wrongful-death suit, that the plaintiff could recover if the evidence convinced them that the health-care provider deprived the plaintiff of a "substantial possibility" of survival. *Weimer, supra,* 309 Md. at 543, 525 A.2d 643. Admittedly, a twenty-to thirty-percent reduction in chances of survival would amount to loss of a "substantial possibility" of survival in the jurisdictions that follow the rule advocated by the plaintiff in *Weimer* (*see, e.g., Herskovits v. Group Health Coop. of Puget Sound,* 99 Wash.2d 609, 664 P.2d 474 (1983)ʹ (six-month delay in diagnosis of cancer resulted in decedent's loss of a nine-percent chance of survival (34%–25%) and was compensable because the loss was "substantial")). But Maryland follows the traditional rule of causation and requires the plaintiff to prove that a doctor's negligence actually caused the decedent's death. *See Cooper v. Hartman,* 311 Md. 259, 270–71, 533 A.2d 1294 (1987) (there must be a probability that the damages occurred as a result of negligence, not merely a possibility).

Appellant argues, as he did below, that Ms. Schaefer's chance of survival in May of 2001 was irrelevant and that the motions court was required to focus exclusively on the issue of whether, at the time of the malpractice, chances of survival were "greater than fifty percent." We disagree because the argument incorrectly assumes that after the malpractice was discovered the decedent had no chance of survival. *See* Lars

Noah, *An Inventory of Mathematical Blunders in Applying the Loss–of–a–Chance Doctrine,* 24 Rev. of Litig. 369 (2005), where the author states:

> Courts sometimes incorrectly conclude that patients with more than a 50% antecedent chance of survival who then die after negligence by a physician satisfy traditional causation requirements. Instead of assuming that a patient who ultimately dies had absolutely no chance of survival after the physician's negligence (which is only sometimes the case), expert testimony would have to establish what the odds of survival became after the malpractice—only if the differential exceeded 50% would the plaintiff prevail under the traditional rule.

*Id.* at 393–94 (footnotes omitted).

As the dissent points out, under Professor Noah's analysis, recovery would be allowed in this case because the malpractice "more than doubled" Ms. Schaefer's chances of dying from cancer. Research has uncovered no case that has found causation to exist by calculating the risk of morbidity rather than chances of the survival. Apparently, under Professor Noah's approach, recovery would be allowed if a decedent's chance of survival decreased (due to defendant's negligence) from ninety-eight to ninety-five percent because the decedent's "chance of morbidity" would have "more than doubled" from two to five percent. Adoption of such an approach would allow recovery for wrongful death based upon the mere possibility that prior to the malpractice the decedent was not in the two percent of the population that would have died absent the negligence.

In *Weimer,* the Court of Appeals said:

> The rule of law governing the burden of proof in medical malpractice cases was reiterated in *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656 [464 A.2d 1020] ... (1983). In that case, involving survival and wrongful death actions, the late Judge Davidson, speaking for this Court, said:
>
> > *"In Maryland, recovery of damages based on future consequences of an injury may be had only if such*

*consequences are reasonably probable or reasonably certain. Such damages cannot be recovered if future consequences are 'mere possibilities.'* Probability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur). Mere possibility exists when the evidence is anything less. *Davidson v. Miller,* 276 Md. 54, 62 [344 A.2d 422] . . . (1975)."

296 Md. at 666[464 A.2d 1020]. . . .

309 Md. at 549–50, 525 A.2d 643 (emphasis added).

The pertinent issue presented to the motions court in this case was whether the defendants' negligence proximately (more probable than not) caused Ms. Schaefer's death. *Fennell,* 320 Md. at 792, 580 A.2d 206; *Weimer,* 309 Md. at 554, 525 A.2d 643; *Davidson v. Miller,* 276 Md. 54, 62, 344 A.2d 422 (1975). In a case where there is a fifty percent or greater chance of survival when appropriate treatment is rendered, that question normally [11] cannot be answered by focusing exclusively on the chances of survival at the time of the negligent act. For instance, if the chances of a plaintiff's survival from cancer at the time of the act of malpractice was seventy percent, and the chances of survival when the plaintiff first received appropriate medical treatment is sixty-nine percent, it simply cannot be said that this reduction of the decedent's chance of survival by one percent "more probabl[y] than not" caused plaintiff's death from cancer.

In his deposition, Dr. Shmookler did not contradict Dr. Hutchins' eighty-percent-chance-of-survival testimony or Dr. Bristow's fifty-to-sixty-percent-chance-of-survival opinion. Dr. Shmookler testified, in legal effect, that, at the time of the acts of malpractice by the defendant doctors, it was "more probable than not" that the patient's cancer would be cured. This,

---

**11.** The one exception to this rule would be if at the time of the act of professional negligence the patient's chance of survival with appropriate treatment was one hundred percent and the patient dies after the defendant's negligence reduced, by any percentage, the decedent's survival chances.

obviously, is not the same as saying that the acts of malpractice by the defendants in August–September 2000 caused Ms. Schaefer to die in 2005. *See McDermott,* 786 N.E.2d at 76. *See also Liotta v. Rainey,* 2000 WL 1738355 (Ohio Ct.App. 2000) (upholding directed verdict in favor of defendant physicians where the chance of survival was eighty-nine percent when the defendant should have detected cancer and fifty percent when cancer was detected).

The motions judge ruled on the motion for summary judgment after he struck the affidavits of Drs. Hutchins and Shmookler. Without those affidavits, summary judgment was appropriate because the evidence, taken in the light most favorable to the appellant, showed only a possibility that the appellees' negligence caused Ms. Schaefer's death.

The foregoing holding requires us to resolve the second issue presented by appellant, viz.:

Did the motions judge err when he struck the affidavits of Drs. Hutchins or Shmookler?

## VI.

Maryland Rule 2–501(e) reads:

(e) **Contradictory Affidavit or Statement.** (1) A party may file a motion to strike an affidavit or other statement under oath to the extent that it contradicts any prior sworn statement of the person making the affidavit or statement. Prior sworn statements include (A) testimony at a prior hearing, (B) an answer to an interrogatory, and (C) deposition testimony that has not been corrected by changes made within the time allowed by Rule 2–415.

(2) If the court finds that the affidavit or other statement under oath materially contradicts the prior sworn statement, the court shall strike the contradictory part unless the court determines that (A) the person reasonably believed the prior statement to be true based on facts known to the person at the time the prior statement was made, and (B) the statement in the affidavit or other statement under oath is based on facts that were not known to the person

and could not reasonably have been known to the person at the time the prior statement was made or, if the prior statement was made in a deposition, within the time allowed by Rule 2–415(d) for correcting the deposition.

## A. *Dr. Hutchins' Affidavit*

■ After appellees filed their motion for summary judgment, appellant filed affidavits of Dr. Hutchins and Dr. Shmookler. Counsel for Dr. Moen and Women's OB/GYN, P.A., filed a motion to strike Dr. Hutchins' affidavit based on Maryland Rule 2–501(e). Movants pointed out that at his deposition, which was taken on January 30, 2006, Dr. Hutchins was asked: "Are you going to be rendering an opinion within reasonable medical probability as to Ms. Schaefer's cause of death?" Dr. Hutchins answered "no" to that question.

In Dr. Hutchins' affidavit filed July 13, 2006, he said, in pertinent part:

This will confirm that I hold the following opinion within a reasonable degree of medical probability: Dr. Moen's failure to properly diagnose Ms. Schaeffer's [sic] condition as an early carcinoma of the uterus, and/or a precancerous lesion and/or some form of hyperplasia in August or September of 2000 and the resultant failure to begin immediate treatment were the proximate cause of Ms. Schaeffer's [sic] death.

I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

Counsel for Dr. Moen and Women's OB/GYN, P.A., in their motion to strike, argued:

Dr. Hutchins indisputably testified during his January 2006 deposition that he would not be rendering an opinion on Ms. Schaefer's cause of death. Shockingly, [p]laintiff now offers an [a]ffidavit of Dr. Hutchins supplying a novel (albeit not supportable) opinion on Ms. Schaefer's cause of death. This [c]ourt should not abide such an effort to forestall summary judgment through the use of a sham

[a]ffidavit, and Maryland Rule 2–501(e) indicates that such an [a]ffidavit must be stricken.

The motions judge agreed with movants that, based on Rule 2–501(e), Dr. Hutchins' affidavit should be stricken.

In his brief, appellant argues that Dr. Hutchins' contradiction was "not material." In support of that contention, appellant says:

Dr. Hutchins['] contradiction arguably was to indicate in his deposition that he had no opinion on causation (versus an affirmative assertion regarding causation), whereas in his affidavit he expressed the opinion that Dr. Moen's negligence was a proximate cause of death. *Of course, Dr. Hutchins also testified at deposition that he can render an opinion on the prognosis for a woman with early cancer of the endometrium (the condition Dr. Moen failed to diagnose in Ms. Schaefer in August of 2000), and that the overwhelming majority of such women are cured.*

(Emphasis added.)

The testimony by Dr. Hutchins showing an ability to give a prognosis (eighty-percent chance of survival) as of the date of the alleged malpractice could not possibly have alerted defense counsel to the fact that he was prepared to testify that malpractice was the cause of death, especially in view of the fact that Dr. Hutchins also testified that he would defer to Dr. Bristow's opinion that when he (Dr. Bristow) first saw Ms. Schaefer the patient had a fifty- to sixty-percent chance of survival.

At deposition, Dr. Hutchins flatly said he was not going to be giving an opinion as to the cause of Ms. Schaefer's death. In his affidavit, Dr. Hutchins expressed an opinion as to the cause of Ms. Schaefer's death. In other words, without any explanation (*see* Md. Rule 2–501(e)(2)), Dr. Hutchins did the exact opposite of what he said at deposition that he was not going to do. It is difficult to imagine a more stark contradiction than the one complained about by movants.

Although not raised as an excuse in the trial court, or in appellant's opening brief, appellant argues in his reply brief that Dr. Hutchins'

> "no" response to the question of whether he would be rendering an opinion as to the cause of death came after an extended discussion as to which cancer—endometrial or ovarian—was the ultimate cause. His "no," therefore, meant simply that he would not differentiate which of the two cancers caused Ms. Schaefer's death.

(Reference to extract omitted.)

The above argument is misleading. Although it is technically true that Dr. Hutchins' "no" answer came *after* a series of questions concerning his view as to which cancer caused Ms. Schaefer's death, the answer was given *long* after the aforementioned discussion was concluded, six pages afterward, to be precise. Appellant's explanation for Dr. Hutchins' contradiction is simply not supported by the record.

The motions judge did not err in striking Dr. Hutchins' affidavit, which was directed against Dr. Moen and Women's OB/GYN, P.A.

**B.**

■ Fifteen days after appellant filed the affidavits of Drs. Hutchins and Shmookler, a hearing on the motion for summary judgment was held. At the hearing, counsel for Dr. Decandido and Anne Arundel Medical Center moved to strike Dr. Shmookler's affidavit, which was directed exclusively at them. The affidavit read, in material part:

> 1. I understand that I have been designated as a medical expert in the field of pathology by the plaintiffs in this case. In that connection, I have reviewed the pathology slides of the decedent, Sherri Schaeffer [sic], as well as the original endometrial biopsy and other medical records. I provided a deposition at the request of the defendants to this action. My background is set forth in the appended curriculum vitae which I understand will be appended hereto and is adopted herein by reference.

2. The failure to properly evaluate the ovarian tumor of Sherri Schaeffer [sic] in September of 2000, when it was in an early stage, was a substantial factor in proximately causing her death.

I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

In their brief, Dr. Decandido and the Anne Arundel Medical Center argue, as they did below, that even if the affidavit were accepted at face value, it would not help appellant defeat summary judgment because "none of the opinions [were] expressed to a reasonable degree of medical probability or certainty."

In his reply brief, appellant does not even bother to address this contention. Although appellees' argument appears to have merit, we shall affirm the circuit court's decision to strike on other grounds.

Dr. Decandido and the Anne Arundel Medical Center also argue that the affidavit contradicted what Dr. Shmookler said at deposition. The relevant testimony was as follows:

[QUESTION:] Do you have an opinion to a reasonable degree of medical probability as to what her staging was in July [sic] of 2001?

[ANSWER:] *No, I don't,* because as I said, that's more— particularly in a case like this, I would defer to an oncologist or gynecologic oncologist. They would stage this.

(Emphasis added.)

Regarding prognosis, Dr. Shmookler testified:

[QUESTION:] Do you have an opinion with a reasonable degree of medical probability as to Ms. Schaefer's prognosis in May of 2001?

[ANSWER:] *Not as far as survival or anything like that. I'm not going to be going into that.*

(Emphasis added.)

In his affidavit, Dr. Shmookler stated:

The failure to properly evaluate the ovarian tumor of Sherri Schaefer in September 2000, when it was in an early stage, was a substantial factor in proximately causing her death.

Dr. Decandido and the Anne Arundel Medical Center argue:

In order to prove causation in this matter, the [a]ppellants must show the patient's prognosis at the time of the alleged negligence (August/September 2000) compared to the patient's prognosis at the time of diagnosis (April 2001). In this case, Dr. Shmookler unequivocally testified that he had no opinion as to the patient's prognosis at the time of diagnosis (i.e., he did not know). In fact, he indicated that he would defer to an oncologist on that issue.

The [a]ppellants cannot prove causation without addressing the prognosis when she was diagnosed with cancer and treatment began. The [a]ppellants do not contend that the cancer was never diagnosed. Instead, it is alleged that the diagnosis was delayed by approximately seven months. Therefore, the worsening *vel non* of prognosis attributable to the alleged delay is the critical question when determining causation.

(Reference to appendix omitted.)

In his opening brief, appellant's only argument as to the (alleged impropriety) of striking Dr. Shmookler's affidavit is as follows:

Dr. Shmookler's "contradiction" is even less apparent [than the alleged contradiction in Dr. Hutchins' affidavit]. At deposition, [Dr. Shmookler] indicated he had no opinion regarding Ms. Schaefer's prognosis *in May of 2001,* whereas in his affidavit he expressed the opinion that the failure to properly evaluate the ovarian tumor (in September of 2000) was a proximate cause of death. This opinion comes as no surprise, given that his "Certificate of Merit" (filed before Ms. Schaefer's demise) specifies that defendants' negligence was the proximate cause of injuries she sustained, namely the spread of her cancer.

Hypothetically, had Dr. Hutchins or Dr. Shmookler testified at deposition that defendants' negligence was *not* a

proximate cause or was *unlikely* to have been a proximate cause of death, their subsequent affidavits would "materially contradict" their prior testimony. That not being the case, however, the lower court's decision to strike the affidavits pursuant to Rule 2–501(e) constitutes reversible error.

The appellant, in his reply brief, says that there was no contradiction because what Ms. Schaefer's prognosis was for recovery in May of 2001 was irrelevant. He cites no legal authority for this proposition.

As shown in Part V, *supra*, in a case of this sort, it is highly relevant as to what a decedent's chance of survival is at the time appropriate treatment is commenced. Without an opinion in that regard, no expert, no matter how well qualified, can say in a case like this whether it is more probable than not that a healthcare provider's negligence caused the patient's death. We therefore agree with the circuit court and with appellees that there was a material contradiction between what Dr. Shmookler told the attorneys in deposition and what he said in his affidavit.

Appellant contends, apparently, that even if there was a contradiction between what Dr. Shmookler said in his deposition and what he said in his affidavit, the affidavit should not have been stricken because appellees "were not surprised" by the affidavit's contents. According to appellant, the reason for this lack of surprise was that, prior to Ms. Schaefer's death, Dr. Shmookler had filed a certificate of merit saying that the "[d]efendant's departure from the standard of care . . . was the proximate cause of injuries she sustained, namely the spread of her cancer." First, the certificate-of-merit issue was not even mentioned by appellant as an excuse in the circuit court. Second, the certificate of merit was not under oath and could not be utilized to defeat summary judgment. *See* Md. Rule 2–501(b). Third, Dr. Shmookler did not opine in his "certificate of merit" that the negligence of any defendant caused Ms. Schaefer's death. He opined that the negligence "caused . . . the spread of cancer." As mentioned earlier (n. 1, *supra* ), when this case was presented to the motions court, the sole issue briefed and argued was whether summary

judgment should be granted because appellant could not prove that the negligence of the defendants caused Ms. Schaefer's death. Appellant never contended that, even if the evidence was insufficient to prove that appellees' negligence caused Ms. Schaefer's death, the evidence was nevertheless sufficient to support a survivorship action based on the expenses incurred, pain endured, and other damages caused by the delayed treatment. Thus, even if it were material, there is no evidence that appellees were unsurprised by the contents of Dr. Shmookler's affidavit.

For the foregoing reasons, we hold that the circuit court did not err in striking the affidavit of Dr. Shmookler.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

Dissenting Opinion by MEREDITH, J.

## 1. The patient's greatly increased likelihood of death established probable causation.

As the majority opinion recognizes, this is not a case in which the plaintiff sought to recover for a "loss of chance" of survival for a patient whose probability of survival was less than 50% at the time of the alleged negligence. At the time of the alleged negligence of the defendants in this case, assuming all facts in a light most favorable to the plaintiff, as we are obligated to do at this stage in the litigation, the patient's likelihood of survival was rather good: 80%. Stated another way, at the time of the defendants' alleged negligence, the patient's odds of successful treatment were 4–to–1, and the patient's statistical likelihood of death was only 20%, or one chance in five. As a consequence of the delay in treatment caused by the defendants' alleged negligence, the patient's statistical likelihood of death more than doubled, to approximately 50%, before treatment was begun. Under such circumstances, a rational trier of fact could conclude that the defendants' negligence was the probable cause of the patient's death. To conclude otherwise requires a finding that, at the time of the missed diagnosis, the patient was among the 20% who were going to die anyway. From a probability stand-

point, however, it is much more probable (by a ratio of 4-to-1) that the patient was among the 80% who would survive if properly treated. I do not understand how one could rationally conclude that the delay that reduced the patient's odds of survival from 4-to-1 to merely 1-to-1 was not a probable cause of her ultimate 100% death. Accordingly, I would reverse the judgment of the circuit court.

Unlike the plaintiffs who asserted the claims in *Weimer* and *Fennell* even though it was undisputed that their likelihood of death exceeded 50% before any act of medical negligence, the plaintiff in this case offers proof that, at the time of the defendants' alleged negligence, the patient's chance of survival was 4 times greater than her likelihood of death. Unlike *Weimer* and *Fennell,* liability in this case does not depend upon the recognition of an action for loss of a chance. The traditional standard of causation, as expressed in the Maryland Pattern Jury Instructions, MPJI-Cv 19:10, can be met. The pattern instruction on causation states:

> For the plaintiff to recover damages, the defendant's negligence must be a cause of the plaintiff's injury. [There may be more than one cause of an injury, that is, several negligent acts may work together. Each person whose negligent act is a cause of an injury is responsible.]

We do not need to resort to statistics and estimates to know that the patient in this case died. Notwithstanding the evidence that, at the time her treatment was eventually begun, there was a statistical likelihood of survival of 50% for patients whose cancer had progressed to a stage similar to Ms. Schaefer's, we now know with certainty that she was among the 50% who would ultimately die. The pertinent causation question for the trier of fact is whether it is probable that she was, at the time of the defendants' alleged negligence, already in the group who would die regardless of treatment. Statistical probability does help us answer that question: because 80% of all patients would survive, it is statistically much more likely than not that Ms. Schaefer was in the 80% group who would survive (rather than the 20% group who would not) if treatment had begun at the time of the defendants' alleged negli-

gence. Common sense permits a rational conclusion that the delay occasioned by the defendants' alleged negligence most likely caused Ms. Schaefer to shift from the group comprised of the 80% of all patients who would survive into the group who ultimately would not.

This common sense conclusion is supported by mathematics. Professor Lars Noah, of the University of Florida Levin College of Law, has written a law review article that points out the mathematical blunders lawyers and judges frequently make when analyzing statistics regarding the likelihood of patient survival. Lars Noah, *An Inventory of Mathematical Blunders in Applying the Loss-of-a-Chance Doctrine*, 24 Rev. Litig. 369 (2005). In the article, Professor Noah points out the arithmetical fallacy in the analysis that led to the entry of summary judgment for the defendants in this case. Professor Noah explains that it is *not* arithmetically correct to require (as the majority opinion does) that a plaintiff demonstrate that the defendants' negligence resulted in more than a 50% loss of a chance of survival. On the contrary, he asserts that the correct analysis would focus upon the patient's increased risk of death and permit recovery when the attributable risk ratio was over 50%. Professor Noah explains that, if the patient's likelihood of death more than doubles between the date of the missed diagnosis and the date treatment begins, and the patient in fact dies, then the delay was a *probable* cause—not merely a possible cause—of the patient's death. In contrast to the analysis set forth in the majority opinion, Professor Noah observes, *id.* at 393–97:

> Some courts ... demand[ ] that the plaintiff demonstrate that the defendant's negligence resulted in more than a 50% *loss* of a chance of survival.
>
> Under the latter view, a patient who experiences a drop [in likelihood of survival] from 60% to 40% (20 percentage points) fails on causation grounds, as does a drop from 60% to 15% (45 percentage points), but a patient who drops from 60% to 5% (55 percentage points) would prevail. In fact, **this approach results in an error ... insofar as the patient who experiences the 45 percentage point drop**

(from 60% to 15%) also should satisfy traditional causation requirements because the alleged negligence more than doubled the mortality rate from 40% to 85% (calculated by subtracting each of the survival estimates from 100%). Although it amounts to the same 45 percentage point change, here an increase rather than a decrease, these numbers give a "relative risk" (a.k.a. "rate ratio") of 2.13 (.85/.40), where 1.0 functions as the baseline, or an "attributable risk" (a.k.a. "attributable fraction") of 53% ((.85–.40)/ .85), which means that the defendant's negligence probably caused the ultimate injury.

In this vein, one might say that courts make a mistake of looking through the wrong end of the telescope. Some courts have endorsed an "increased risk" theory as the basis for recognizing loss-of-a-chance claims, but they nonetheless still tend to frame the statistical information in terms of reductions in the probability of survival caused by the malpractice. **Instead of asking about the loss of a chance for survival, courts should focus on the flip-side question framed as the increased risk of morbidity and mortality.**

. . .

**[I]f a patient would have enjoyed an 85% chance of survival, which then drops to 68% due to the negligent failure to diagnose, the courts mistakenly view it as a 17 percentage point or perhaps a 20% ((.85–.68)/.85) loss of a chance of survival. If converted into risk estimates, these numbers actually would satisfy the traditional causation standard, at least insofar as the patient's odds of dying have more than doubled, from 15% to 32% ((.32– .15)/.32 = 53.1%). This attributable risk calculation does not exclude the possibility that the patient would have died in any event, but, as courts increasingly require in tort cases, proof of a doubling in the relative risk after exposure may help to establish causation by a preponderance of the evidence.**

(Bold emphasis added; footnotes omitted.)

Applying the relative risk analysis urged by Professor Noah to the present case would produce the following result. The

patient's risk of death rose from 20% at the time of the missed diagnosis to 50% by the time the cancer was diagnosed and treatment was begun; in other words, the risk of death "more than doubled." Inserting these numbers into Professor Noah's equations produces the following: (.50–.20)/.50 = 60.0%. That is, the delay attributable to the defendants' missed diagnosis increased the patient's "attributable risk" of death by 60%, which is, obviously, more than 50%, and therefore, sufficient to attribute causation to the physicians who negligently missed the diagnosis.

As in the last example quoted from Professor Noah's article, the patient's odds of dying in this case more than doubled (from 20% to 50%) between the time of the missed diagnosis and the beginning of treatment. As Professor Noah states, this "means that the defendant[s'] negligence probably caused the ultimate injury." *Id.* at 394.

Although the majority opinion purports to base its affirmance of the judgment in favor of the defendants upon an arithmetical analysis (concluding that "the alleged malpractice diminished Ms. Schaefer's chance of survival by, at most, thirty percent"), the majority refuses to recognize that the more appropriate question is whether the alleged malpractice increased the likelihood of the death that ultimately occurred by more than 100% during the period of delay. From a probability standpoint, the rational trier of fact could rationally conclude that the delay was the probable cause of the patient's death if the delay caused the statistical risk of death to more than double.

The majority opinion dismisses this analysis as focusing upon a "mere possibility" of causation. On the contrary, this analysis focuses directly upon probability and only permits recovery for wrongful death when the evidence establishes that the delay was a probable cause of the patient's death. The example used by the majority opinion in its attempt to illustrate a fallacy in Professor Noah's formula appears, at first blush, to expose a flaw in the theory. But upon examination, the example confirms that focusing upon likelihood of

mortality is the proper approach. The majority opinion states:

> Apparently, under Professor Noah's approach, recovery would be allowed if a decedent's chance of survival decreased (due to defendant's negligence) from ninety-eight to ninety-five percent because the decedent's "chance of morbidity" would have "more than doubled" from two to five percent. Adoption of such an approach would allow recovery for wrongful death based upon the mere possibility that prior to the malpractice the decedent was not in the two percent of the population that would have died absent the negligence.

Putting aside the extreme nature of the hypothetical, and the fact that few such cases will arise because there is such a small chance of mortality in any event (that is to say, even after the delay in treatment, 95% of the patients survived and the other 5% who died were not all victims of negligent treatment), if we focus upon the group of patients who did, in fact die, it is rational to attribute causation to the delay that more than doubled their risk of death. In this example, at the time of the alleged negligence, only two patients out of 100 would die regardless of treatment. And, indeed, it is *possible* that the plaintiff's decedent was one of those two. From a statistical analysis of the patient population, however, it is extremely unlikely that plaintiff's decedent was one of those two because 98% of all patients with this condition survive if properly treated at that point time. The example further assumes that, as a consequence of medical malpractice, treatment is delayed for a period of time, and that, as a direct consequence of the delay, by the time treatment begins for plaintiff's decedent, five out of 100 patients will die. We know with 100% certainty that plaintiff's decedent was one of those five patients who would eventually die. If we focus on the five patients who eventually die regardless of treatment, we know that, from a statistical standpoint, only two of those five patients would have died if treatment had been initiated at the time of the defendants' medical malpractice; the other three patients would have survived if treatment had been initiated at

the time of the malpractice. Again, it is *possible* that decedent's patient was among the two who would eventually die regardless of treatment. But it is more *probable* that plaintiff's decedent was among the three who would have otherwise survived simply because that is a larger group. Focusing upon probability, it is more likely than not—*i.e.*, probable—that plaintiff's decedent in this example would have survived had the treatment not been delayed by the defendants' malpractice.

Returning to the case before the Court, the majority opinion assumes that the patient's chances of survival were as high as 80% at the time of the alleged malpractice that resulted in a delay in treatment, and as low as 50% at the point in time that Ms. Schaefer's treatment was begun. In the population of patients with a similar medical condition, 20 out of 100 would die regardless of whether treatment was initiated at the time of the alleged malpractice. As a direct consequence of the delay caused by the alleged malpractice, in the population of patients with a condition similar to Ms. Schaefer's worsened state as of the time her treatment was belatedly begun, 50 out of 100 would die despite being properly treated. We know that Ms. Schaefer was one of those 50 patients who would ultimately die. From a statistical standpoint, any given patient, including Ms. Schaefer, was more likely to be among the 30 patients whose condition progressed to the point of being unsurvivable during the period of delay, with only a 40% likelihood (*i.e.*, 20 out of 50) that she was among the 20 patients who were already terminally ill at the time of the defendants' alleged negligence.

We should not analyze this issue by looking through the wrong end of the telescope, which is what Professor Noah concludes the analysis employed in the majority opinion does. In this case, our common sense tells us that the delay probably caused the patient's cancer to progress to a point that precluded her survival. Although resort to mathematical formulas should not even be necessary, in this case at least, as Professor Noah has made clear, the arithmetic, when properly

employed, confirms our common sense conclusion regarding causation.

The numbers do not preclude a finding that the delay caused by the defendants' alleged negligence was a probable cause of Ms. Schaefer's eventual death. Consequently, the numbers do not support granting the appellees' motions for summary judgment.

## 2. The sham affidavit rule

I also disagree that the affidavits of Dr. Hutchins and Dr. Shmookler were properly stricken as "sham" affidavits. Such a ruling suggests that these expert witnesses outright lied at the time they affirmed the statements made in the affidavits. That inference is based upon an alleged "contradiction" between the deposition testimony and the affidavits. As the commentators state in the Maryland Rules Commentary, the recently adopted Rule 2–501(e) "sets up the presumption that an affidavit or other sworn testimony that materially conflicts with prior sworn testimony of that person is a 'sham' and may be stricken." PAUL V. NIEMEYER & LINDA M. SCHUETT, MARYLAND RULES COMMENTARY at Supp. 50 (3d ed.2003, 2006 supp.). *Cf. Pittman v. Atl. Realty Co.*, 359 Md. 513, 539, 754 A.2d 1030 (2000) (holding, prior to adoption of current Rule 2–501(e), that it is improper for motion court to decide credibility of affidavit testimony).

Although there is undeniably a difference between the expert witnesses' deposition testimony and the affidavits, the distinction is not so irreconcilable that, as a matter of law, the court should refuse to give any credence whatsoever to the statements made in the affidavits. Whether the statements were untimely and should have been disregarded because they were in flagrant conflict with the scheduling order in the case is a different issue. *Cf. Rodriguez v. Clarke*, 400 Md. 39, 69–70, 926 A.2d 736 (2007) ("The Clarkes' preterition reflected by their sparse expert witness designation, elusive answers to interrogatories, and failure to communicate, warrant preclusion of their experts—the sanctions were proportionate to the

discovery abuse"). But that was not the basis relied upon by either the circuit court or the majority opinion. In my view, the supplemental opinions expressed by the experts in their affidavits in this case did not contradict the opinions they had previously expressed. The affidavits were not irreconcilably at odds with the opinions expressed by them at their depositions, and the affidavits should not have been considered mere shams subject to being stricken under Rule 2–501(e).

An appropriate test for assessing whether an affidavit should be considered a sham would be this: if the statement made during the deposition of the witness, when fairly considered in context and in light of any explanatory statements given during the deposition, is assumed to be the true testimony of the witness, would the statement in the affidavit necessarily be false? If so, the affidavit should not be given effect by the court unless the witness can satisfy the court that the provisions of Rule 2–501(e)(2) apply and thereby satisfactorily explain the contradiction.

In this case, however, neither expert expressed an opinion during the deposition and then purported to express a contradictory opinion by way of affidavit. The experts were asked whether they intended to express an opinion on causation, and each answered that he did not so intend as of the date of the deposition. Changing one's mind as to whether to make any statement about a subject is different from expressing one opinion and then expressing the opposite opinion. And, in most cases, the scope of subject areas as to which an expert will be asked to testify is within the knowledge and control of counsel rather than the witness.

The allegedly contradictory deposition testimony, in each instance, related to the witness's present state of mind with respect to his intended future conduct. In Dr. Hutchins's case, he answered "no" when asked: "Are you going to be rendering an opinion within reasonable medical probability as to Ms. Schaefer's cause of death?" Dr. Shmookler's allegedly contradictory testimony was similar: "I'm not going to be going into that."

The situation is similar to one in which a person testifies on the date of his deposition, "I am not going to eat tomorrow," but then nevertheless eats something the following day. If the witness then gave an affidavit swearing that he ate the day after the deposition, such testimony does not contradict the fact that he intended otherwise at the time of his earlier testimony. It may not be expected by the other party—which might or might not present a basis to preclude the supplemental testimony on the topic—but the affidavit testimony is not so inherently incredible or such an obvious sham that it should be treated as false and stricken on the basis of Rule 2–501(e). *See generally Pittman, supra,* 359 Md. 513, 754 A.2d 1030, in which Judge Rodowsky sets out many sound reasons for exercising judicial restraint in connection with a sham affidavit rule.

Whether the supplemental opinions of these experts came too late in the discovery process for the court to consider them is a different question from whether they contradicted the opinion testimony previously given by the witnesses. But Rule 2–501(e) should not be the basis of excluding affidavits that contain supplemental opinions of experts.